[No. E009497. Fourth Dist., Div. Two. Mar. 22, 1993.]

THE PEOPLE ex rel. DEPARTMENT OF TRANSPORTATION, Plaintiff and Appellant, v.
DIVERSIFIED PROPERTIES COMPANY III, Defendant and Respondent.

430

**COUNSEL**

Joseph A. Montoya, Charles E. Spencer, Jr., William M. McMillan, Anthony J. Ruffolo, Robert W. Vidor, Larry R. Danielson and Carol Jo Morgan for Plaintiff and Appellant.

Parker, Milliken, Clark, O'Hara & Samuelian, Richard L. Franck and Rosa Linda Cruz for Defendant and Respondent.

## OPINION

TIMLIN, J.—This is an eminent domain action. The condemnor is the State of California, ex relatione the California Department of Transportation (hereinafter, the State), and the condemnee is Diversified Properties Company III (hereinafter, DPC), a limited partnership which is the owner/ prospective developer of the commercially zoned realty which was condemned by the State in this action (hereinafter, the subject property).

The State has appealed from those portions of the judgment in condemnation entered below in which the trial court (1) awarded damages for unreasonable delay by the State in instituting its direct condemnation action —basing its appeal on the fact that the trial court found a constructive or de facto taking of the subject property by the State at a time precedent to the unreasonable delay—and (2) imposed a 10 percent postjudgment interest rate on the compensation and damages awarded to DPC.

The State has raised the following contentions: (1) There was insufficient evidence to support the trial court's finding that the State had effected a "de facto taking" of the subject property some two and one-half years prior to the filing of the within eminent domain action (in essence, a finding that the State had inversely condemned the subject property on the earlier date); (2) the trial court erred in finding that the State was liable to DPC for damages flowing from "unreasonable pre-condemnation activities" which occurred after the date of the "de facto taking";[1] and (3) the trial court erred in applying a 10 percent postjudgment interest rate to the total amount of compensation and damages awarded to DPC.

We shall conclude that the State is in error as to its first contention, but that it is correct as to its other contentions concerning the award of damages to DPC for unreasonable precondemnation activities by the State and concerning the postjudgment interest rate to be applied to the sums awarded to DPC. Consequently, we shall affirm the judgment entered below as to the State's "de facto taking," but we shall reverse the judgment insofar as it (a)

---

[1]In reviewing the record on appeal, we have found that the parties and the trial court referred to this particular issue by using various phrases—such as "unreasonable pre-condemnation delay," "unlawful pre-condemnation activities," and the like—interchangeably. In like manner, no significance attaches to the fact that this opinion may use slightly different phrases at different points in the opinion in referring to this issue.

assesses damages against the State for "unreasonable pre-condemnation activities" and (b) applies a 10 percent postjudgment interest rate to the compensation award. We shall remand this matter to the trial court with directions that it modify its judgment so as to reflect the views and conclusions set forth in this opinion.

### FACTS

In early 1983, DPC began to negotiate for the purchase of a 17.385-acre parcel of land located on the northeast corner of the intersection of Haven and Highland Avenues in the City of Rancho Cucamonga (hereinafter, the City). It was DPC's intention to develop the parcel as a commercial center, a use which constituted the highest and best economic use of the parcel and for which the parcel was appropriately zoned. During the negotiations, DPC learned that approximately the southerly 300 feet of the parcel (roughly 3 acres, fronting on Highland Avenue) had been designated by the State as potential freeway right-of-way. On June 10, 1983, DPC entered into a formal purchase agreement to acquire the entire 17.385-acre parcel of land. In recognition of the potential for a future right-of-way acquisition by the State, the purchase agreement contained a promise by the seller of the parcel that it would pay DPC the difference, if any, between the pro rata amount paid by DPC for the three-acre strip and the amount received by DPC from the State for that strip if the State were ever to acquire it.

During the ensuing months, while the escrow on the purchase of the parcel was being processed, DPC was in continuous contact with the City and the State concerning the status of the three-acre strip. On June 14, 1984, just prior to the close of escrow and in response to an inquiry from DPC, the State sent a letter to DPC which contained the following paragraph:

"Caltrans [the State] currently has funds available to buy [the] proposed right of way for the freeway to prevent development within that freeway right of way area. If the City of Rancho Cucamonga indicates to Caltrans, in writing, that your organization has a viable shopping center development proposed for the northeast quadrant of Haven and Highland Avenues, Caltrans will be in a position to appraise and acquire the right of way area at its fair market value. Please understand that you must have a development which is eminent [sic], as we cannot buy right of way area for development scheduled for some time in the future. The City should indicate that they [sic] would approve development of the total property if it were not for Caltrans' need to protect the right of way."

During this same period of time, while DPC's escrow was being processed, the City informed DPC that it (the City) would not approve a

development plan that included development of the three-acre strip "because Caltrans had agreed that they would purchase it." This policy of the City was based on a general understanding or informal agreement between the City and the State.

DPC closed escrow on the purchase of the entire 17.385-acre parcel on July 31, 1984. Immediately thereafter, DPC moved forward to obtain City approval of a development plan for the parcel.

The original development plan submitted to the City by DPC for approval was set forth on parcel map 9416 and did not, pursuant to the previous direction from the City, include development of the three-acre strip at the southerly end of the larger parcel. This three-acre strip was designated on parcel map 9416 as parcel 10. DPC's development plan for the larger parcel was approved by the City on April 24, 1985, and parcel map 9416 was itself later approved in December of 1985.

Upon approval of parcel map 9416 in April of 1985, DPC asked the City to inform the State of the imminent development of the larger parcel so as to "trigger" the State's "protective purchase" of parcel 10 (the three-acre strip) in accord with its June 14, 1984 letter (above). The City refused to send a "triggering letter" to the State on the ground that it (the City) was in the midst of reevaluating the traffic flow patterns of the Haven-Highland inter-section—which reevaluation might disclose the need for a redesign of the freeway interchange planned for that location (which, in turn, might require that the State acquire more than parcel 10 to accommodate the new interchange).

In fact, the City finally determined that the traffic demands of the Haven-Highland intersection were such that a partial cloverleaf freeway inter-change, rather than a diamond interchange, was needed at the freeway location in question. It appeared from initial studies that the suggested change in the design of the freeway interchange would necessitate a further one and one-half acre acquisition by the State from DPC's larger parcel.

DPC submitted a revised development plan and a revised parcel map 9416 for approval, which revised map designated an additional one and one-half acres located across the southerly portion of DPC's parcel 9 as having been "set aside" for the revised freeway interchange. This acreage had been designated by DPC in its original development plans and parcel map for commercial development. The City approved the revised parcel map 9416, which map contained the following notation: "No development shall occur on Parcel 9 until California Department of Transportation confirms future

freeway corridor across the site."[2] Thus, the size of the "set aside" from DPC's larger parcel to accommodate the State's future freeway plans (which became the revised parcel 10 on the revised parcel map 9416) eventually totalled approximately four and one-half acres. This four and one-half acres is the subject property of the within action.

On April 15, 1986, the City wrote the State a letter requesting that it exercise its "protective acquisition" authority with respect to the four and one-half acres "set aside" from DPC's larger parcel. The letter stated, in part:

"Because the originally contemplated second phase of the shopping center has been greatly reduced by the additional right of way requirements for the new interchange and the originally contemplated third phase of the shopping center was intended to extend all the way to Highland Avenue, it is requested at this time that you initiate proceedings for the purchase of this right of way as a protection measure."

The City's April 15, 1986, letter was followed by a clarifying letter from the City to the State written on August 6, 1986, which letter identified the subject property as having been "reserved for the Route 30 Corridor" and further stated, in part: "The City's General Plan designates the subject project within the Neighborhood Commercial land use zone. The area reserved for the future freeway could have conceivably been developed with additional commercial uses."

In contradistinction to the tone of its June 14, 1984, letter to DPC, the State moved lethargically in response to the City's letters of April 15, 1986 and August 6, 1986, to the State. Despite repeated urging by DPC, the State failed to present DPC with any sort of a concrete acquisition offer for the subject parcel until approximately one to one and one-half years later, in September of 1987, at which time the State made DPC an offer for the property. DPC refused the State's offer and made a counteroffer of its own, which counteroffer the State refused. In refusing to accept DPC's counteroffer, the State told DPC that it would have to accept the State's original offer or it (DPC) "could wait 10 years until [the State] needed the property to build the freeway and then [the State] would condemn it." DPC then initiated an inverse condemnation action against the State in December of 1987. After extensive legal "maneuverings," DPC agreed to dismiss its inverse condemnation action in conjunction with the State's filing of the within direct condemnation action.

---

[2]Although the record on appeal does not indisputably establish the fact, the State and DPC are in agreement that this restrictive notation was also placed by the City on DPC's original development plans and parcel map.

Following a trial on the matter, a judgment in condemnation was entered below, which judgment, among other things, contained the following adjudications/determinations:

(1) "On the issue of precondemnation damages, the court finds that there was excessive delay by the State in commencing this action, beginning on January 1, 1987; that the defendant Diversified was entitled to damages, for the period commencing from January 1, 1987, to October 18, 1988. As compensation for precondemnation delay the jury found that defendant Diversified is entitled to an award of $207,988 [for] the period from January 1, 1987, until October 18, 1988."

(2) "On the issue of constructive taking, the court finds there was direct interference by plaintiff with Diversified's right to develop its property commencing on April 15, 1986, sufficient to constitute a de facto taking of Diversified's property. Damages for said de facto taking are assessed as the apportionment rate of interest on the net award of compensation as provided by Code of Civil Procedure § 1268.35[0]."

(3) "The total amounts as above provided, including interest, shall bear interest at the rate of 10% after the entry of judgment."

Additional facts will be referred to, as needed, in the discussion which follows.

DISCUSSION

I.

*The State's "De Facto Taking" of the Subject Property*

The State contends that there is insufficient evidence to support the trial court's finding that the State effected a "de facto taking" of the subject property on April 15, 1986. The State's contention is without merit.

■ The legal principles which guide our analysis of this contention are well established:

(1) "In de facto taking cases, the landowner claims that because of particularly oppressive acts by the public authority the 'taking' actually has occurred earlier than the date set by statute . . . ." (*Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39, 46 [104 Cal.Rptr. 1, 500 P.2d 1345]; hereinafter cited simply as *Klopping.*)

(2) The governmental regulation of the development of land rises to the level of a "taking" if it "denies an owner economically viable use of his land." (*Agins* v. *Tiburon* (1980) 447 U.S. 255, 260 [65 L.Ed.2d 106, 111, 100 S.Ct. 2138].)[3]

(3) "What constitutes oppression, or direct and substantial impairment of property rights by the condemner, is essentially a factual question, one determinable on a case-by-case basis." (*City of Los Angeles* v. *Waller* (1979) 90 Cal.App.3d 766, 778 [154 Cal.Rptr. 12].)[4]

 " 'In resolving the issue of the sufficiency of the evidence, we are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment. [Citation.] All issues of credibility are likewise within the province of the trier of fact. [Citation.] "In brief, the appellate court ordinarily *looks only at the evidence supporting the successful party, and disregards the contrary showing.*" [Citation.] All conflicts, therefore, must be resolved in favor of the respondent. [Citation.]' (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480], italics in original.)" (*Marshall* v. *Department of Water & Power, supra,* 219 Cal.App.3d 1124, 1141.)

 Having reviewed the within record on appeal in accord with the above legal principles, we find ourselves of a mind similar to that of our

---

[3]This principle was recently restated by the United States Supreme Court in even stronger terms: "We think, in short, that there are good reasons for our frequently expressed belief that when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." (*Lucas* v. *So. Carolina Coastal Council* (1992) 505 U.S. __, __ [120 L.Ed.2d 798, 815, 112 S.Ct. 2886, 2895], fn. omitted.)

Our Supreme Court has stated this principle of law in similar terms. In *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266 [157 Cal.Rptr. 372, 598 P.2d 25] (overruled on other grounds by *First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304 [96 L.Ed.2d 250, 107 S.Ct. 2378], in discussing the degree to which a zoning ordinance must constrain the use of land before it can be said to have effected a "taking," our Supreme Court held "that a zoning ordinance may be unconstitutional and subject to invalidation only when its effect is to deprive the landowner of substantially all reasonable use of his property." (24 Cal.3d at p. 277.)

Finally, and on a related issue, we realize that the authorities which we have herein cited are "regulatory taking" cases and that the within case is not, in precise terms, such a case. However, we do not find that distinction to be of significance in this instance. Insofar as the constitutional mandate of just compensation is concerned, we see little to choose between "formal regulation" and "informal, but concrete, control."

[4]We note, although it is an observation that is not critical to our discussion of the issues in this case, that the factual determination of whether a "taking" has occurred is a determination to be made by the trial court and not by the jury. (*Marshall* v. *Department of Water & Power* (1990) 219 Cal.App.3d 1124, 1140 [268 Cal.Rptr. 559].)

sister court which issued the *Marshall* opinion (*supra*): "Without repeating it all, we conclude that the evidence summarized above provides the requisite substantial evidence to support the court's determination . . . ." (219 Cal.App.3d at p. 1141.)

The State argues forcefully that it was the regulatory actions of the City, not the State, that precluded DPC from realizing any economic value from the subject property as of and after April 15, 1986. However, the State's argument cannot withstand close scrutiny. In this case, the evidence established that: (1) The City and the State "cooperated" with each other with respect to the nondevelopment of DPC's property within and along the State's proposed freeway route (as shown by, among other things, the fact that the freeway route was depicted and imposed on DPC's development plans, including the revised parcel map 9416 which showed the full four and one-half acre size of the subject property); (2) the State knew that the City had deprived DPC of virtually all right to develop the subject property and that this development restriction rendered the subject property virtually unmarketable; (3) the State knew that the City's restrictions on the development of the subject property were based solely on the fact that the property was located within the proposed freeway route;[5] and (4) the State had no intention of actually condemning the subject property for many years (although it was arguably willing to buy the property at an earlier date if an agreeable purchase price could be negotiated).

Based on all of the above, we cannot meaningfully distinguish this case from *Jones* v. *People* ex rel. *Dept. of Transportation* (1978) 22 Cal.3d 144 [148 Cal.Rptr. 640, 583 P.2d 165]. As summarized in another case, *Jones* involved the following circumstances: ". . . *Jones* . . . [is] an example of a taking by indirect government action. There, plaintiffs bought property with frontage on Fair Oaks Boulevard, intending to subdivide, with access from the boulevard to the subdivision. The Department of Transportation announced plans to construct a freeway which would cross plaintiffs' property and cut off access from Fair Oaks Boulevard. Pursuant to provisions of the Streets and Highway Code, the department entered into a freeway agreement with the county to reroute or close streets which would intersect with the

---

[5]At oral argument, the State continued to insist that it was the City, and not the State, which had prohibited the development of the subject parcel and that it (the State) had not known (and could not have known) of the City's prohibition of such development until the revised parcel map 9416 was filed. The record flatly contradicts the State's position. The City's letters of April 15, 1986, and August 6, 1986, to the State clearly reflected the ongoing "understanding" between the City and the State that the City would, where appropriate, "reserve" property within the "Route 30 Corridor" (the State's freeway route) from development for no other reason than to allow the State to acquire the property at a lesser cost.

freeway, and further providing that no road could be opened into or connected with a freeway without permission of the state commission. The county refused to approve plaintiffs' subdivision map because of the state's freeway requirements. [¶] The Supreme Court held that plaintiffs were entitled to recover damages against the state because its actions substantially impaired their access. [Citation.] The state blamed the county, arguing the county erroneously interpreted the law and the agreement when it refused plaintiffs' map. The court said the state could not rely on this contention because the state had implied that it concurred plaintiffs were not entitled to access due to the impending freeway project. [Citation.]" (*Gilbert* v. *State of California* (1990) 218 Cal.App.3d 234, 257 [266 Cal.Rptr. 891].)

The State attempts to distinguish *Jones* by pointing out that the State and the county had entered into a formal freeway agreement in *Jones* while such an agreement is lacking in this case. That distinction, however, does not lessen the persuasiveness and applicability of our Supreme Court's reasoning in *Jones* in the context of the facts of this case. In this case:

(1) The State made absolutely no effort before or immediately after April 15, 1986, to move expeditiously forward to acquire the subject property at a purchase price reflecting fair market value—a process which the State, as part of its freeway property acquisition program, denominated as a "protective acquisition" program. We cannot ignore the State's 1984 letter to DPC, before DPC actually completed its purchase of the larger parcel, that if an imminent and viable development of the property was approved by the City and the City advised the State of such approval, it (the State) had funds to purchase the subject property and it would be in the position to acquire the subject property. When the State received such a letter from the City—the April 15, 1986, letter—it (the State) did not advise DPC that it no longer had the funds and/or an interest in acquiring the subject property. To the contrary, the State made its first offer to purchase the subject property in August of 1987—one year and four months after the City sent its "triggering letter" to the State.

(2) Moreover, there was no evidence to suggest that before, or at any time after, April 15, 1986, the State informed the City that there was no need to constrain the development of the subject property because it would be several more years before the State needed it for freeway construction. Instead, the State merely "sat back" and allowed the City, by way of its development restrictions, to "bank" the subject property for the State— presumably so that the State could, at a later date, condemn the subject property in an undeveloped (and, consequently, less costly) condition.

 To quote from *Jones*: "In these circumstances, plaintiffs would suffer a manifest injustice if the state were allowed at this late date to avoid liability for the consequences of its conduct on the ground that [it had been the "other" governmental entity which had actually precluded development of the subject property]." (22 Cal.3d at p. 153.)[6]

 Substantial evidence supported the trial court's determination that the State had effected a "de facto taking" of the subject property on April 15, 1986.[7]

---

[6]The State also attempts to distinguish *Jones* from the within case on two other grounds: (1) In *Jones*, development was prohibited as to all of the property owners' land, while only a part of DPC's property was so restricted; and (2) in *Jones*, the property owners were deprived of all access to their land, while no such deprivation of access was imposed in this case. These distinctions are meaningless insofar as the issues before us are concerned. While it is true that not all of DPC's *larger* parcel was "taken" by the State, it is also true that all of the subject parcel *was* "taken" by the State—and it is the inverse condemnation of the subject parcel that we are here concerned with. In a similar vein, while it is true that not all of DPC's access to the subject parcel was taken by the State, it is also true that access to the subject parcel is absolutely meaningless and valueless if the subject parcel itself cannot be developed.

[7]The State has also argued that DPC was obligated to submit a development plan for the subject property to the City, and obtain the City's rejection thereof, in order to exhaust its "administrative remedies" prior to seeking to obtain just compensation for a "de facto taking" of the subject property. Both parties agree that an exhaustion of administrative remedies is normally a prerequisite to bringing an action such as the one which precipitated the within lawsuit (DPC's inverse condemnation action). Both parties also agree that there is a general "futility" exception to the requirement that administrative remedies be exhausted in such cases. Here, the dispute between the parties is as to whether a "futility exception" was established by the evidence. We think it to be beyond reasonable argument, based on the evidence before us, that it would have been futile for DPC to have submitted a development plan to the City in an effort to receive permission to develop parcel 10.

On a related issue, the State has cited the case of *Patrick Media Group, Inc.* v. *California Coastal Com.* (1992) 9 Cal.App.4th 592, 606-618 [11 Cal.Rptr.2d 824], for the proposition that DPC was obligated to pursue its legal remedies against the City (by way of first exhausting its administrative remedies and then by filing an administrative mandamus/inverse condemnation action against the City) before it was entitled to pursue its judicial remedies against the State. We are not persuaded:

(1) First, it is not at all clear that *Patrick* applies to the facts of this case. In *Patrick*, there was but a single governmental entity (the California Coastal Commission) involved: That is, it was the same entity that had made an express, administrative determination impacting the property owner's interests which was first being sued by the property owner in inverse condemnation, prior to an administrative appeal/administrative mandamus lawsuit course of action being pursued. Here, it is the City which has made the administrative determination but the State which is being sued in inverse condemnation.

(2) Second, and far more importantly, we conclude, in reliance on the authority and reasoning in *Jones*, that the State is simply *estopped* to assert that it is "really" the City which is at fault in this instance and, thus, that it is the City which must first face legal action in this matter. (22 Cal.3d at p. 153.)

II.

*The Award of Damages for "Unreasonable Pre-condemnation Activities"*

██ The State contends that the trial court erred in finding that it (the State) was liable to DPC for $207,988 in damages resulting from "unreasonable pre-condemnation activities" which occurred after the date of the "de facto taking" of the subject property (often times referred to as "*Klopping* damages"). We agree. Here, as discussed above, the trial court determined (on substantial evidence) that the State had *taken* (that is, had inversely *condemned*) the subject property on April 15, 1986. Thus, it hardly seems logical that the State could be liable to DPC for damages resulting from *pre*condemnation activities which occurred *after* the date of the "de facto taking"—the period of time during which the damages accrued having been determined by the trial court to run from January 1, 1987, to October 18, 1988. In this instance at any rate, both law and logic produce the same conclusion.

██ ██ Our analysis of this issue begins with an understanding of the interrelationship between two distinct levels of governmental interference with the lawful enjoyment of private property: "We perceive in eminent domain cases—or 'just compensation' cases—various degrees of culpability on the part of the public entity which entitle condemnees to an escalating amount of relief, depending upon the determination of the degree. Unusually oppressive conduct results in a determination of 'de facto taking' while *delay* is answerable in proximately caused damages." (*City of Los Angeles* v. *Waller, supra,* 90 Cal.App.3d at p. 778; see also *Klopping, supra,* 8 Cal.3d at pp. 46-47, 58.)[8]

Thus, reported case authority is replete with examples of situations in which property owners: (1) Successfully sued a governmental entity for damages resulting from "unreasonable pre-condemnation activities" even though the governmental entity never subsequently condemned, either directly or inversely, the property in question (see, e.g., *Tilem* v. *City of Los Angeles* (1983) 142 Cal.App.3d 694) [191 Cal.Rptr. 229]; *or* (2) successfully sued a governmental entity for damages resulting from "unreasonable pre-condemnation activities" occurring prior to the governmental entity's subsequent condemnation of the property in question, for which condemnation the

---

[8]Of course, there are many degrees of governmental "interference" with private property rights which call for no recompense at all. (See, e.g., *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110 [109 Cal.Rptr. 799, 514 P.2d 111]—in which case our Supreme Court held that the mere adoption of a general plan does not give rise to a cause of action for damages against the adopting governmental entity by property owners whose property is "impinged upon" by certain aspects of the plan.)

governmental entity paid the full measure of "just compensation" (see, e.g., *Stone* v. *City of Los Angeles* (1975) 51 Cal.App.3d 987 [124 Cal.Rptr. 822]).

However, there is *no* reported case authority of which we are aware that countenances the award of damages resulting from a governmental entity's "unreasonable pre-condemnation activities" which occurred after a property has been "taken" by that governmental entity. As explained in another opinion: "Stated otherwise, *Klopping* damages are damages for the condemnee's loss of use or enjoyment of his adversely affected property *occasioned during the precondemnation period* by the condemnor's unreasonable conduct.[7]" Footnote 7 of the quoted passage provides: "This is why there is no duplication in damages in awarding a property owner both *Klopping* damages, on the one hand, and taking and severance damages on the other." (*City of Los Angeles* v. *Monahan* (1976) 55 Cal.App.3d 846, 852 [127 Cal.Rptr. 763], italics added.)[9] In this case, there *would* be a duplication in damages in awarding DPC the $207,988 in "*Klopping* damages" because DPC received a full payment of *interest* on its condemnation award which "ran" *from the date of the "de facto taking."*[10]

Citing *First Lutheran Church* v. *Los Angeles County, supra*, 482 U.S. 304 [96 L.Ed.2d 250, 107 S.Ct.2378], DPC argues that, if it is obligated to bear the expense of its "carrying costs" for the subject property for that period of time during which the State delayed in bringing a direct condemnation action, it will have been unjustly obligated to bear expenses which ought to have been borne by the public. DPC misunderstands. Once the State had inversely "taken" the subject property, the delay was DPC's—not the State's. As discussed previously, the State "took" the subject property on April 15, 1986—and from that date forward DPC was entitled to sue the State in inverse condemnation to recover the value of its property and any compensable amount of severance damages. As discussed above, DPC did finally avail itself of this remedy—but not until December of 1987, a full year and eight months after the date of the "de facto taking."

---

[9]The Comment to BAJI No. 11.79 cites *Monahan* to the following effect: "In a de facto taking, the valuation date is the date of the taking, hence no Klopping damages; . . ."

[10]Although the cases do not address the precise point raised here, both *People* ex rel. *Dept. Pub. Wks.* v. *Peninsula Enterprises, Inc.* (1979) 91 Cal.App.3d 332, 358-359 [153 Cal.Rptr. 895] (wherein the Court of Appeal considered whether "*Klopping* damages" could continue to accrue after a condemnor had filed its eminent domain action and concluded that such an accrual of damages should be allowed only in very rare situations), and *People* ex rel. *Dept. of Transportation* v. *Gardella Square* (1988) 200 Cal.App.3d 559, 570-575 [246 Cal.Rptr. 139] (wherein the Court of Appeal considered whether interest should accrue from the date of the taking in a "de facto taking" case—and concluded that it should), apply an underlying analytical rationale which is in accord with that which we have applied in this case.

The judgment in condemnation entered below must be modified by striking therefrom the $207,988 award of "*Klopping* damages" to DPC (together with any interest thereon).

### III.

*The Appropriate Postjudgment Interest Rate*

██ The State contends that the trial court erred by applying a 10 percent postjudgment interest rate to the judgment amounts awarded to DPC in this matter for compensation of every kind, including severance damages. We agree.

The legal principles which inform the awarding of interest in condemnation actions were carefully considered and fully articulated by our Supreme Court in *Redevelopment Agency* v. *Gilmore* (1985) 38 Cal.3d 790, 796-807 [214 Cal.Rptr. 904, 700 P.2d 794] (hereinafter cited simply as *Gilmore*). ██ In general terms, those principles are as follows:

(1) An owner whose land (or interest(s) therein) has been "taken" is entitled under both the federal and state Constitutions to receive the full measure of "just compensation" for that land. (38 Cal.3d at pp. 796-797.)

(2) The full measure of "just compensation" includes the payment of interest at a fair and reasonable rate "as reimbursement for lost use of money due as compensation for the property, but not paid contemporaneously with the taking." (38 Cal.3d at p. 799, italics and fn. omitted.)

(3) The payment of interest, and the determination of the rate of interest to be applied, in a "taking" case is a judicial function that cannot be constrained by state statutory provisions. (38 Cal.3d at pp. 797, 801, 803, 806, quoting, in part, from *Phelps* v. *United States* (1927) 274 U.S. 341 [71 L.Ed. 1083, 47 S.Ct. 611] and *Seaboard Air Line Ry.* v. *United States* (1923) 261 U.S. 299 [67 L.Ed. 664, 43 S.Ct. 354].)

(4) It is the duty of the trial court, in each instance, to determine the appropriate "prevailing market rate" of interest to be applied in a "taking" case. (38 Cal.3d at p. 806.)

These same general principles of law apply equally in "de facto taking" cases such as this one. (*People* ex rel. *Dept. of Transportation* v. *Gardella*

*Square, supra,* 200 Cal.App.3d 559, 571.)[11] The interest in such cases runs from the date of the "taking." (*Id.,* at p. 574.)

 In this case, apparently relying on section 685.010, subdivision (a) of the Code of Civil Procedure (concerning the interest which accrues "on the principal amount of a money judgment remaining unsatisfied"), the trial court imposed a 10 percent postjudgment interest rate on the sums awarded to DPC in the judgment in condemnation.[12]

DPC argues that an award of interest at a lesser rate than 10 percent in condemnation cases would violate the "equal protection" clauses of the federal and state Constitutions by invalidly creating an arbitrary "classification" distinguishing between "judgment creditors" in condemnation cases and judgment creditors in all other civil cases.[13] The State, on the other hand, argues that the Legislature has, by virtue of its enactment of sections 1268.310 and 1268.350 of the Code of Civil Procedure, established an "apportionment market rate formula" that dictates the interest rate to be applied in condemnation cases.[14] Neither party is correct.

 DPC's "equal protection" challenge to anything less than a 10 percent interest rate—failing, as DPC concedes, to implicate "suspect classifications" or "fundamental interests"—must be reviewed by us under the "rationality test":[15] " 'The Equal Protection Clause . . . den[ies] to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of the statute. A classification *must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and*

---

[11]We note that section 1268.311 of the Code of Civil Procedure clearly evinces the Legislature's intent that the interest awarded in an inverse condemnation case be calculated in the same manner as the interest awarded in a direct condemnation case.

[12]Section 685.010, subdivision (a) of the Code of Civil Procedure states: "Interest accrues at the rate of 10 percent per annum on the principal amount of a money judgment remaining unsatisfied."

[13]In this part of our discussion, we use the phrase "condemnation cases" to refer equally to both direct condemnation cases and inverse condemnation cases.

[14]These two statutory provisions are part of California's Eminent Domain Law (pt. 3, tit. 7 of the Code Civ. Proc., beginning with § 1230.010).

Section 1268.310 of the Code of Civil Procedure states, in pertinent part: "The compensation awarded in the proceeding shall draw interest, computed as prescribed by Section 1268.350, from the earliest of the following dates: . . ."

Section 1268.350 of the Code of Civil Procedure states, in pertinent part: "(a) As used in this section: (1) 'Apportionment rate' means the apportionment rate calculated by the Controller as the rate of earnings by the Surplus Money Investment Fund for each six-month period. . . . (b) The rate of interest payable under this article for each six-month period, or fraction thereof, for which interest is due, shall be the apportionment rate for the immediately *preceding* six-month period."

[15]See *Brown* v. *Merlo* (1973) 8 Cal.3d 855, 862, fn. 2 [106 Cal.Rptr. 388, 506 P.2d 212].

*substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.*" ' [Citations.] Thus, when a statute provides that one class shall receive different treatment from another, our constitutional provisions demand more 'than nondiscriminatory application within the class . . . establish[ed] . . . . [They] also [impose] a requirement of some rationality in the nature of the class singled out.' [Citations.]" (*Brown* v. *Merlo, supra,* 8 Cal.3d 855, 861-862.) As stated somewhat more succinctly by our Supreme Court in *Brown*: "Under our state and federal 'equal protection' provisions a statute may single out a class for distinctive treatment only if such classification bears a rational relation to the purposes of the legislation." (8 Cal.3d at p. 861.)

 Here, there is a rational basis for distinguishing between, on the one hand, those judgment creditors who are entitled to 10 percent postjudgment interest on judgments remaining unpaid under the authority of section 685.010, subdivision (a) of the Code of Civil Procedure and, on the other hand, those "judgment creditors" who are entitled to "market rate" postjudgment interest on condemnation judgments remaining unpaid: Our Supreme Court has recognized (albeit in a different context) that "unpaid condemnation awards are *sui generis* and difficult to compare with other obligations." (*Gilmore, supra,* 38 Cal.3d at p. 805.) The differences between "condemnation judgments" and "non-condemnation judgments" are manifest —and the most manifest of these differences, insofar as the issue of postjudgment interest is concerned, is simply this: With regard to "non-condemnation judgments," postjudgment interest is something which is *legislatively added to* the underlying payment obligation established by the judgment— while, with regard to "condemnation judgments," postjudgment interest is something which is *constitutionally mandated as a part of* the underlying payment obligation established by the judgment, every bit as much as prejudgment interest also is a constituent element of just compensation (i.e., postjudgment interest is an integral part of the "just compensation" to which a condemnee is constitutionally entitled). (*Redevelopment Agency* v. *Erganian* (1989) 211 Cal.App.3d 166, 175 [259 Cal.Rptr. 213].) The Legislature could rationally conclude that, to the extent postjudgment interest constitutes a part of the "just compensation" to be awarded in a condemnation case, the postjudgment interest should accrue at the same "market rate" as prejudgment interest.[16] DPC's "equal protection" argument is without merit.

 So, too, however, is the State's argument without merit. As discussed above, the setting of the rate of interest to be applied in a

---

[16]As implicitly noted in *Gilmore*, it has always been accepted that the interest rate schema that applies in condemnation cases applies equally to both pre- and postjudgment periods of time. (*Gilmore, supra,* 38 Cal.3d at p. 795, fn. 2.)

condemnation case is a judicial function, not a legislative function. As noted in DPC's respondent's brief, the California Senate Committee on the Judiciary seemed to be fully aware of this fact when it considered amending section 1268.310 et seq., of the Code of Civil Procedure: "This bill would replace the statutory 'legal rate' of interest [regarding condemnation awards] with a rate tied to the Surplus Money Investment Fund. In light of *Gilmore* and *Kirby [Forest Industries, Inc.* v. *United States* (1984) 467 U.S. 1 (81 L.Ed.2d 1, 104 S.Ct. 2187)], holding that the rate of interest is a constitutional question, it seems a change in statutory rate will at best be viewed by the courts as advisory only." (Sen. Com. on Judiciary, coms. on Sen. Bill No. 1782 (1985-1986 Reg. Sess.).) In short, the fact that the Legislature has enacted a statutory scheme for fixing the postjudgment interest rate to be paid in condemnation cases does not dictate the judicial determination as to what actual postjudgment interest rate should be applied in a particular case.

In *San Bernardino County Flood Control Dist.* v. *Grabowski* (1988) 205 Cal.App.3d 885 [252 Cal.Rptr. 676], this court analyzed the issue of what postjudgment interest rate was to be applied in a condemnation case when a trial court was confronted with extant market rates of interest below the legislatively fixed rate of interest applicable at that time. In *Grabowski*, we concluded that the Legislature *could* set (although it did not have to set) a postjudgment interest rate which would act as a "floor" in condemnation cases—notwithstanding the fact that that "floor" was higher than the extant market rates of interest—and that any legislatively set interest rate "floor" that otherwise met constitutional muster should be applied by the trial court when that "floor" exceeded the extant market rates of interest. (205 Cal.App.3d at p. 904.) The legislative postjudgment interest rate schema at issue in *Grabowski* required that "legal interest" be paid on judgments entered in condemnation cases (Code Civ. Proc., § 1268.310, as then worded)—and "legal interest" was 10 percent (Code Civ. Proc., § 685.010).

We noted in *Grabowski* (205 Cal.App.3d at p. 901, fn. 10) that the Legislature had amended section 1268.310 et seq., effective January 1, 1987, to set forth a "floating" apportionment interest rate formula, tied to the (regularly updated) rate of return earned by the state in its Surplus Money Investment Fund, whereby the trial court could determine the rate of postjudgment interest to be applied to the compensation awarded in condemnation cases. Following the principles and analysis we adopted in *Grabowski* for dealing with this issue, we conclude that this legislative change established a new "floor" for postjudgment interest in condemnation cases—a "floor" set by the "floating" apportionment rate of interest defined and established in section 1268.350 of the Code of Civil Procedure. In each

condemnation case, the trial court is to independently determine the extant market rate of interest and then apply the higher of: (i) that market rate of interest, or (ii) the legislatively created apportionment rate of interest set forth in section 1268.350 of the Code of Civil Procedure.

Although we continue to adhere to a "*Grabowski* analysis" of this interest rate issue, we acknowledge that the above-noted amendments to section 1268.310 et seq., of the Code of Civil Procedure will have some significant and practical consequences for the determination of the postjudgment interest rate to be applied in condemnation cases:

(1) Inasmuch as the rate of return earned by the state on its Surplus Money Investment Fund continually "floats" so as to reflect a relatively current matrix of market rates of interest, it is unlikely that the interest rate fixed pursuant to the legislative schema will ever be found to deviate widely from a trial court's independent determination of extant market rates.

(2) The apportionment rate of interest earned by the state on its Surplus Money Investment Fund is itself independent evidence of market rates of interest upon which the trial court can rely in independently determining extant market rates of interest. Indeed, absent a compelling showing by a party that other market rates of interest were more appropriate under the particular facts of a case, we find it hard to imagine that a trial court could be found to have abused its discretion in simply relying on the apportionment rate of return in setting the rate of postjudgment interest to be applied in a condemnation case.[17]

Inasmuch as the trial court incorrectly determined the postjudgment rate of interest to be applied in this case (and, consequently, incorrectly determined the amount of postjudgment interest due as a part of the overall "just

---

[17]On a related issue, the State argues that our analysis of this interest rate issue ignores *Gilmore*'s footnote number 21 (38 Cal.3d at p. 807):

"As the text notes, our discussion of judicial procedures for calculating adequate interest assumes that no legislative guidelines, based on prevailing market rates, have been adopted. Nothing in this opinion is intended to prevent the Legislature from enacting its own prevailing-rate formula. Nor need a legislative formula adhere strictly to that set forth in this opinion, so long as the general requirements of 'just compensation' we have discussed are satisfied."

The State is incorrect. Our "*Grabowski* analysis" is entirely consistent with this portion of *Gilmore*. Insofar as a legislative "prevailing-rate formula" is concerned, all we are saying is that the *ultimate* determination of what constitutes "just compensation" (including the interest element of such compensation) is a judicial function, not a legislative one—and that the judiciary, while it can "use" a legislative formula in arriving at a determination of the appropriate interest rate to be applied in a condemnation case, is not absolutely bound by such a formula in making such a determination.

compensation" to be awarded), this matter must be remanded to the trial court for an appropriate redetermination of the amount of postjudgment interest to be included in DPC's award of "just compensation."

## DISPOSITION

The judgment in condemnation entered below is reversed insofar as it: (1) Awarded DPC damages for so-called "unreasonable pre-condemnation activities" by the State; and (2) ordered interest, calculated at a 10 percent postjudgment interest rate, on the compensation awarded to DPC. In all other respects, the judgment entered below is affirmed in full.

This matter is remanded to the trial court with directions that it modify the judgment in condemnation entered herein consistent with the views and conclusions set forth in this opinion.

Ramirez, P.J., and McDaniel, J.,* concurred.

A petition for a rehearing was denied April 9, 1993, and appellant's petition for review by the Supreme Court was denied July 1, 1993.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, senior judge status (Gov. Code, § 75028.1), sitting under assignment by the Chairperson of the Judicial Council.