Filed 9/26/17; Modified and Certified for Pub. 10/19/17 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DRYDEN OAKS, LLC et al., | D069161 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2014-00004077-CU-EI-NC) |
| SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Earl H. Maas, III, Judge. Affirmed.

Freeland McKinley & McKinley, Steven A. McKinley and Karen G. McKinley for Plaintiffs and Appellants.

San Diego County Regional Airport Authority and Amy Gonzalez; Gatze Dillon & Ballance LLP, Lori D. Ballance, Stephen F. Tee and Michael P. Masterson for Defendant and Respondent San Diego County Regional Airport Authority.

Thomas E. Montgomery, County Counsel, Judith A. McDonough and John P. Cooley, Deputy County Counsel for Defendant and Respondent County of San Diego.

In 2001, Michael Durkin used two limited liability companies—Dryden Oaks LLC and Durkin-CAC Lot 24, LLC—to purchase two lots directly adjacent to the McClellan Palomar Airport (Airport) in the City of Carlsbad, California (City). His development plans for the two lots were initially successful despite determinations by the San Diego County Regional Airport Authority (Authority) that the proposed projects were not compatible with the Airport. Overriding the Authority's objections, the City issued a planned industrial permit and Durkin completed the construction of a commercial building on one of the lots in 2005. He also obtained a permit from the City for construction of a second building on the other lot. Both permits included provisions in which Durkin agreed to hold the City harmless for any liability arising out of approval of the projects.

Durkin's permit on the second lot expired in 2012 without the commencement of any construction. By the time Durkin sought to restart the permitting process with the City, the Authority had adopted an Airport Land Use Compatibility Plan (ALUCP) that designated Durkin's properties as being within a Safety Zone that carries specific limiting recommendations for compatible land uses. Despite having approved Durkin's previous permit application, the City now refused to override the recommendations in the ALUCP.

Under California law, it is the City that bears ultimate responsibility for deciding which property development projects to permit. But apparently unable or unwilling to sue the City, in February 2014 Durkin filed an inverse condemnation action against the

2

Authority and the County of San Diego (County). Durkin's complaint asserted that the value of his property was depressed by the Authority's 2010 adoption of the ALUCP and that the decrease in value constituted a governmental taking requiring the County and the Authority to provide compensation.

We conclude the trial court properly entered summary judgment in favor of the County and the Authority on the ground that undisputed evidence shows there was no taking by these defendants. To the extent Durkin has any arguable claim, which we express no opinion on, it would be against the City. Based on established legal principles, nothing done by the Authority or the County amounts to a taking of Durkin's property. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

At the time the complaint was filed, Dryden Oaks owned a parcel of real property known as Lot 25 and Durkin-CAC owned a parcel known as Lot 24. The two lots are located in the County of San Diego and the City of Carlsbad at the west end of the Airport, adjacent to the end of a runway. When Durkin purchased the lots, they were designated as part of the Airport's Runway Protection Zone (RPZ) on the County's Airport Layout Plan (ALP), a long-range planning tool that preceded the ALUCP. The Federal Aviation Administration defines a RPZ as "[a]n area at ground level prior to the threshold or beyond the runway end to enhance the safety and protection of people and property on the ground." In March 2000, Durkin entered into an agreement to purchase Lots 24 and 25 (and a third lot, Lot 23, not at issue in the litigation), which were part of a development known as the Carlsbad Airport Centre, from the Callaway Golf Company.

3

Durkin visited the property 14 times prior to signing the purchase agreement and observed the lots' proximity to the airport.

The transaction was in escrow for approximately 15 months, closing in June 2001. Durkin paid $474,000 for Lot 24 and $310,000 for Lot 25. Prior to the close of the transaction, Durkin submitted an application to the City for a permit to construct a 29,000 square foot industrial building on Lot 24. In December 2001, the City submitted the application to the Authority for a determination as to whether the proposed project was consistent with the 1994 Comprehensive Land Use Plan for the Airport, a predecessor plan to the ALUCP. Roughly two months later, the Authority issued a determination that it could not make an administrative finding that the project was consistent with that plan because the property was "located within the 75 CNEL zone of the McClellan-Palomar Airport" and the proposed industrial development was not compatible. The Authority's letter communicating its decision indicated that the City could pursue the development through the override procedures contained in Public Utilities Code section 21676.[1]

In June 2002, the City passed a resolution overriding the Authority's determination "as to noise compatibility only" conditioned on "internal noise reduction, Notices of Restrictions, Hold Harmless Agreements, and exemptions from outdoor eating area requirements . . . ." It also issued planned industrial permits (PIP No. 00-04 and PIP No. 00-04(A)) to Durkin. Each permit contained an indemnification clause in which

_____

[1]     Undesignated statutory references are to the Public Utilities Code.

4

Durkin agreed to hold the City harmless from all liabilities arising out of the approval, development and operation of the project and to execute "a Hold Harmless Agreement regarding aircraft operations and aircraft noise prior to issuance of grading or building permits" to be "reviewed and approved by the City Attorney . . . ." Durkin also gave the County an avigation easement for Lot 24 in the process of developing the property. Thereafter, the project was finished and the building has been leased to various tenants since 2005.[2]

Plans for Lot 25 proceeded on a slower schedule, and it was not until October 2006 that Durkin submitted an application to the City for a planned industrial permit to construct a 30,000 square foot two-story industrial building. As with the project on Lot 24, after Durkin submitted his permit application the plans were submitted to the Authority for a determination as to whether the project was consistent with the applicable airport compatibility plan, which at that time was the 2004 Airport Land Use Compatibility Plan. In February 2007, the Authority provided notice to the City that the Lot 25 project was not consistent with that compatibility plan.

The City also submitted the project proposal to the California Department of Transportation (Caltrans) for comment. In its October 2007 response, Caltrans noted that the proposed development was within the "Runway Protection Zone (RPZ) as depicted

_____

[2]    Durkin and Michael Lamb formed Durkin-CAC in November 2004, with each retaining 50% ownership of the new entity. The operating agreement required Durkin's family trust to convey Lot 24 and Lamb to convey stock worth approximately $250,000 and a $400,000 note to the new entity in exchange for ownership.

5

on the Federal Aviation Administration (FAA) approved Airport Layout Plan" and was therefore " 'very high risk' due to its proximity to the end of the runway." The letter also noted that the "Caltrans Airport Land Use Planning Handbook (Handbook) generally recommends prohibiting all new structures within the RPZ."

Thereafter, as it had with respect to Lot 24, the City voted to override the Authority's determination that the project was inconsistent with the Compatibility Plan and approved Durkin's permit application (PIP No. 06-19). Also, as with Lot 24, the permit required Durkin to hold the City harmless with respect to its development of the property. The permit for Lot 25 stated that "the project is consistent with the safety requirements of the Runway Protection Zone of the currently adopted Airport Land Use Compatibility Plan for the McClellan-Palomar (ALUCP), dated October 2004 . . . . However, according to the Department of Transportation, Division of Aeronautics and the Federal Aviation Administration, the project is located within the Runway Protection Zone as depicted on the May 13, 2004 Federal Aviation Administration approved Airport Layout Plan."

In October 2009, the City issued a three-year extension of the permit for Lot 25, extending its expiration date to 2012.[3] Durkin, however, did not pursue the development of the property before the permit expired. In the interim, the Authority adopted the ALUCP based, in part, on the County's existing ALP. The ALUCP designates six

3      Durkin formed Dryden Oaks, LLC in June 2009 and conveyed Lot 25 to the new entity the same month.

6

different Safety Zones for purposes of determining compatible land uses. The most restrictive is Safety Zone 1, which encompasses the RPZ designated in the ALP. In 2012, the City amended its general plan to ensure its consistency with the ALUCP.

On November 5, 2013, Durkin submitted a preliminary review application to the City to restart the process for the development of Lot 25. The City responded with a letter dated December 3, 2013, outlining the history of the project and explaining that despite the earlier approval the proposed development was no longer feasible because the ALUCP was more restrictive than the prior compatibility plan and the application's proposed use of "research and development" was not permissible. Thereafter, Durkin took no further step to develop the property and in early 2015 sold Lot 25 to Baker Parking LLC for $1.5 million.[4]

Prior to the sale of Lot 25, in February 2014, Durkin filed the underlying complaint against the Authority and the County. The complaint contains four causes of action—two separate claims for inverse condemnation for each lot (causes of action one and three), and two separate claims for "unreasonable pre-condemnation delay and conduct" for each lot (causes of action two and four). It alleges that the Authority's adoption of the ALUCP designating Lots 24 and 25 as part of the RPZ condemned an avigation easement over the property and that the Authority and the County have not paid just compensation for that taking. The complaint also claims that, after the adoption of

---

[4] A condition of the sale closing was that Baker Parking LLC first obtain a site development permit to use the property as an auto storage facility. The City issued the permit on February 3, 2015, approving development of the lot for that use.

7

the ALUCP, one of the two tenants who leased the building on Lot 24 refused to perform its obligation under its rental agreement to expand its use of the property to "include full human occupancy and a higher rent commencing January 1, 2014."[5]

Durkin alleges that "as a subterfuge to avoid condemnation procedures and the payment of just compensation for the taking of the Properties for Airport purposes, Defendants adopted the amended ALUCP . . . thereby prevent[ing] the City of Carlsbad, which has zoning authority over the Properties, from permitting development in accordance with its own zoning regulations, and . . . with the adopted Specific Plan for the Properties." The complaint advances the theory that the adoption of the ALUCP declaring Lots 24 and 25 part of the RPZ was effected to allow the County to acquire the properties for an airport expansion, thereby taking Durkin's rights to develop and use the property. The complaint seeks "compensatory damages according to proof," as well as attorneys fees and litigation costs.

The Authority responded to the complaint with an unsuccessful demurrer. The County answered and shortly thereafter filed a motion for judgment on the pleadings that

_____

5       The only evidence in the appellate record related to this precondemnation allegation for Lot 24 are two emails in September 2014, after the litigation was commenced, between Durkin and City senior planner Van Lynch. In the initial email, Durkin asked Lynch if the City would allow a new lease for the property that would increase the occupancy from the existing lease. Lynch responded that under "[s]ection 2.2.18(b) of the [ALUCP] 'A new occupancy is proposed within an existing building, provided the new occupancy remains within the same or reduced level of occupancy as the most recent one. A new occupancy which increases intensity shall not qualify as an existing land use.' So the existing uses within the building are fine, and can be replaced with permitted uses of the same intensity or of less intensity. Any use that increases intensity of the building would not be found compatible with the ALUCP."

8

was also rejected by the trial court. After conducting discovery, the Authority and the County filed motions for summary judgment. Durkin also filed a motion for summary adjudication of some of the affirmative defenses asserted by the Authority and the County. After extensive briefing and a hearing on the motions, the trial court granted both defendants' motions.[6]

With respect to the County, the court concluded that Durkin failed to establish a triable issue of material fact as to whether the County took any direct action constituting a taking, or that the Authority acted as the agent of the County in its adoption of the ALUCP. With respect to the Authority, the court found Durkin did not establish a triable issue of material fact that the Authority had completed a regulatory taking because it "lack[ed] the authority to make a land use decision" with respect to Durkin's property. The court also rejected Durkin's unreasonable precondemnation claims, finding Durkin failed to raise "a triable issue of material fact as to whether [the] Authority made a public announcement of an intention to acquire either property." The court subsequently entered judgment in favor of the County and the Authority.

DISCUSSION

On appeal, Durkin contends the County and the Authority failed to meet their burden on summary judgment to negate any element of its inverse condemnation claim. Alternatively, Durkin asserts that even if the County and the Authority did meet their

---

[6]    The trial court also granted Durkin's motion in part, finding that the action was filed within the applicable statute of limitations.

9

burden, he showed the existence of a triable issue of fact as to whether the 2010 ALUCP constituted a "disguised taking" that obligated the County and the Authority to provide compensation. Finally, Durkin asserts his claims for unreasonable precondemnation conduct are not reliant on his inverse condemnation claims and that a triable issue of fact exists as to whether there was an announcement of intent to condemn his property.

I

*Standard of Review*

Code of Civil Procedure section 437c, subdivision (c) provides that summary judgment is to be granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. A defendant "moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) A defendant may meet this burden either by showing that one or more elements of a cause of action cannot be established or by showing that there is a complete defense. (*Ibid*.) If the defendant's prima facie case is met, the burden shifts to the plaintiff to show the existence of a triable issue of material fact with respect to that cause of action or defense. (*Id*. at p. 849; *Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 261.)

We review a summary judgment ruling de novo. (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.) "In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment." (*Lenane v. Continental Maritime of*

10

*San Diego, Inc.* (1998) 61 Cal.App.4th 1073, 1079.) "[W]e are not bound by the trial court's stated reasons for its ruling on the motion; we review only the trial court's ruling and not its rationale." (*Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1402.)

## II

### *Inverse Condemnation*

In its order granting summary judgment, the trial court found that Durkin failed to show a triable issue of fact as to whether a regulatory taking occurred. Durkin now contends this finding was error because he showed the adoption of the ALUCP in 2010, reclassifying his property as part of the RPZ, constituted a taking.[7] In response, the Authority contends the trial court correctly concluded that the adoption of the ALUCP does not constitute a taking because the plan is not a final determination with respect to the permissible use of property. Rather, under the relevant statutory provisions, the local land use authority (here the City) is the governmental authority responsible for the final land use decision.

### A

"The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth, [citation], provides that private property shall not 'be taken for public use, without just compensation.' As its text makes plain, the Takings Clause 'does

---

[7]    As set forth in the factual background, the ALUCP did not reclassify Durkin's property as within the RPZ. Rather, it categorized it as part of Safety Zone 1.

11

not prohibit the taking of private property, but instead places a condition on the exercise of that power.' [Citation.] In other words, it 'is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking.' " (*Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 536-537 (*Lingle*).) "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." (*Id.* at p. 537.)

In *Pennsylvania Coal Co. v. Mahon* (1922) 260 U.S. 393, the United States Supreme Court "recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster- and that such 'regulatory takings' may be compensable under the Fifth Amendment." (*Lingle, supra*, 544 U.S. at p. 537) Two categories of regulatory action are generally "deemed *per* se takings for Fifth Amendment purposes. First, where government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation. [Citation.] A second categorical rule applies to regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property. *Lucas* [*v. South Carolina Coastal Council* (1992)] 505 U.S., at 1019, 120 L.Ed.2d 798, 112 S.Ct. 2886[]." (*Lingle*, at p. 538.) In this second category, "the government must pay just compensation for such 'total regulatory takings,' except to the extent that 'background principles of nuisance and property law' independently restrict the owner's intended use of the property." (*Ibid*.)

12

In addition to these two narrow categories of per se regulatory takings, two other types of regulatory taking are generally recognized. As explained in *Lingle*, another type of taking may be established under the multifactor test discussed in *Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104 (*Penn Central*). *Penn Central* considered a takings claim based on New York City's denial of a development permit to the owner of Central Station because of the property's historical landmark designation. The *Penn Central* decision noted the lack of uniformity in how courts had determined what constitutes a "regulatory" taking, then identified the factors that should be used to make that determination. (*Id*. at pp. 123-124.) The first is " 'the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.' " (*Lingle, supra*, 544 U.S. at pp. 538-539.) Secondly, "the 'character of the governmental action'—for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good'—may be relevant in discerning whether a taking has occurred. [Citation.]" (*Id*. at p. 539)

Each of these first three categories of taking, "physical invasion, complete deprivation of beneficial use, or the *Penn Central* multifactor test," share a "common focus on identifying regulatory actions that are 'functionally equivalent' in whole or in part to a direct appropriation of the property or ouster of the owner." (*Powell v. County of Humboldt* (2014) 222 Cal.App.4th 1424, 1436-1437, quoting *Lingle, supra*, 544 U.S. at p. 539.) The fourth category of taking (not at issue here) arises from "challenges to

13

adjudicative land-use exactions—specifically, government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit." (*Lingle*, at p. 546.) Such demands constitute a taking requiring appropriate compensation if they are " 'so onerous that, outside the exactions context, they would be deemed [a] per se physical taking.' " (*Powell*, at p. 1438, italics omitted.)

*Penn Central* emphasized language from earlier precedent that " '[g]overment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law,' " and "accordingly recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values" without running afoul of the takings clause. (*Penn Central, supra*, 438 U.S. at pp. 124-125.) In such cases, the court properly dismisses a " 'taking' challenge[] on the ground that, while the challenged government action caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes." (*Ibid.*; see *Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1027 [the expectations of a property owner are "guided by the understandings of our citizens regarding the content of, and the State's power over, the 'bundle of rights' that they acquire when they obtain title to property."])

*Penn Central* recognized that zoning laws are "the classic example" of such permissible "regulations that destroy[] or adversely affect[] recognized real property interests" but do not require compensation. (*Penn Central, supra*, 438 U.S. at p. 125.) The court noted examples where the rejection of a takings claim was proper even where

14

"the challenged governmental actions prohibited a beneficial use to which individual parcels had previously been devoted and thus caused substantial individualized harm." (*Id*. at pp. 125-126, citing *Miller v. Schoene* (1928) 276 U.S. 272, 279 [upholding statute mandating property owners remove ornamental red cedar trees that jeopardized apple trees cultivated nearby without providing compensation for the value of the red cedar trees] and *Hadacheck v. Sebastian* (1915) 239 U.S. 394 [upholding law prohibiting claimant from continuing operation of brickyard because the legislature reasonably concluded the use was not consistent with neighboring uses].)  " 'It follows from the nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the subject property.  A court cannot determine whether a regulation has gone "too far" unless it knows how far the regulation goes.' "  (*Calprop Corp. v. City of San Diego* (2000) 77 Cal.App.4th 582, 590-591 (*Calprop Corp.*).)

In *Calprop Corp.* this court examined the threshold inquiry of finality in holding that the denial of a requested amendment to a community plan and a conditional use permit to develop a private landfill could not form the basis of a takings claim because it did not indicate what, if any, development would be permitted.  (*Calprop Corp., supra*, 77 Cal.App.4th at p. 598.)  The denial was not ripe because it did not "by any stretch of the imagination establish" that no economically viable development would be permitted by the City.  (*Ibid*.)  In our explanation of the ripeness requirement we explained that " '[u]ntil a property owner has "obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property," "it is impossible to tell

15

whether the land retain[s] any reasonable beneficial use or whether [existing] expectation interests ha[ve] been destroyed.' " (*Id*. at p. 591.) The law requires " 'an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it.' " (*Id.* at p. 592.)

B

Durkin's argument muddles the type of regulatory taking he claims is at issue in this case. It is clear, however, that Durkin does not assert his property has been subjected to a permanent physical invasion. There also has been no *per se* facial regulatory taking under *Lucas v. S. Carolina Coastal Commission, supra*, 505 U.S. 1003. Even Durkin does not allege that the adoption of the ALUCP denied him "all economically beneficial use" of the property.[8]

Rather, Durkin contends that his economic expectations for the properties were diminished by the Authority's adoption of the ALUCP. He argues specifically that the adoption of the plan constituted a "disguised" regulatory taking. The Authority responds, as the trial court concluded, that there is no established category for a "disguised" taking, and, therefore, Durkin's inverse condemnation claims fail. We agree with the Authority that the cases Durkin relies on to support his inverse condemnation claim do not establish a separate category of "disguised" regulatory taking. Instead, they are examples of the various established categories of regulatory takings discussed above.

---

8      Indeed, as of the time the appeal was filed Durkin-CAC Lot 24, LLC continued to receive significant rental income each month and Dryden Oaks LLC sold Lot 25 after filing suit for almost five times what he paid for the property.

16

For instance, Durkin's primary authority, *Sneed v. Riverside County* (1963) 218 Cal.App.2d 205, is a physical takings case. There, plaintiff raised inverse condemnation claims based on Riverside County's adoption of a zoning ordinance that created a new aircraft approach zone above the plaintiff's property with severe height limitations—something between 3 inches and 4 feet—that were lower than *existing* structures. (*Id*. at p. 207.) In reversing the order sustaining the County's demurrer, the court emphasized that commonly accepted and traditional height restrictions have "long been recognized as a valid exercise of the police power." (*Id.* at p. 209.) The plaintiff, however, alleged that the Riverside ordinance was not a traditional height restriction, but that the county was allowing the physical invasion of his property by low-flying aircraft. It was "actual use" of the airspace immediately above plaintiff's land. (*Ibid.*) In purpose and effect, it amounted to the appropriation of an avigation easement, and that might require compensation as a physical taking for public use. (*Id*. at p. 211.) Here, of course, we are not dealing with severe height restrictions, existing structures are not impaired, and Durkin is not claiming anything that could be construed as a physical invasion of his property.

In *Peacock v. County of Sacramento* (1969) 271 Cal.App.2d 845, the Court of Appeal held that substantial evidence supported the trial court's finding that a taking had occurred. The court concluded that height limitations imposed on the plaintiff's property by an ordinance adopted in contemplation of the zoning authority purchasing a private airport for public use, in concert with the denial of development permits, operated to " 'freeze' development of any meaningful kind" and denied the plaintiffs "any practical or

17

beneficial use of their affected property." (*Id*. at p. 862.) Both these cases present examples of zoning changes " 'which arguably [were] designed to obtain ends which the regulating governmental body was only entitled to obtain through paying fair compensation.' " (*Helix Land Co. v. City of San Diego* (1978) 82 Cal.App.3d 932, 942 (*Helix Land*).)[9]

Because the adoption of the ALUCP is neither a physical invasion nor the denial of any economically beneficial use of his property, we analyze Durkin's argument as a challenge based on the multi-factor test set forth in *Penn Central*. In essence, Durkin argues that the value of his property was diminished by the adoption of the plan and, contrary to the Authority's assertion that the plan is an appropriate exercise of the state's police power, the ALUCP is "functionally equivalent to [a] classic taking." (*Lingle, supra,* 544 U.S. at p. 539.)

Durkin's argument omits an important first step required in any regulatory takings analysis. Specifically, was the adoption of the ALUCP a sufficiently final land use

_____

[9] *Kissenger v. City of Los Angeles* (1958) 161 Cal.App.2d 454, cited by Dryden as another example of a "disguised taking," struck an emergency zoning ordinance rezoning the plaintiff's property from R-3 (which allowed multiple dwelling units) to R-1 (which did not) after the city had approved permits for a new multi-unit building and the plaintiff had begun construction. The Court of Appeal upheld the trial court's conclusion that the emergency ordinance was "arbitrary, discriminatory and that it in effect, [was] an attempt on the part of the city to use its police power to take plaintiffs' property without due process of law and without payment of compensation for that taking." (*Id*. at p. 460.) *Kissenger* is significantly distinguishable from the facts of this case. *Helix Land, supra*, 82 Cal.App.3d 932, also cited by Durkin, upheld the trial court's order sustaining the defendants' demurrer where the plaintiff's complaint made no factual allegations "demonstrating that the zoning ordinance or the flood plain zone classification [at issue] were a property-taking device rather than a regulation of the use of land." (*Id*. at p. 943.)

determination to support Durkin's inverse condemnation claims?  None of the cases relied on by Durkin had occasion to address this critical issue.  Here, importantly, the Authority did not have the ability to make a final land use decision with respect to Durkin's property.  On that basis, we conclude the adoption of the plan was not a sufficiently final land use decision to support Durkin's claims.

The State Aeronautics Act (§§ 21001 et seq.) requires each county in which an airport is located to establish a seven-member Airport Land Use Commission (ALUC), which occupies an advisory role to "assist local agencies in ensuring compatible land uses in the vicinity of" airports.  (§ 21674, subd. (a), see § 21670.)  By statute, these advisory bodies consist of two representatives of the cities within the county (appointed by a selection committee of the cities' mayors); two representatives of the county, appointed by the county's board of supervisors; two aviation experts appointed by a selection committee comprised of the managers of all of the public airports in the county; and one representative of the general public, appointed by the other six members.  (§ 21670, subd. (b).)  The Aeronautics Act provides that the ALUC in San Diego County is the Authority and that it "shall be responsible for the preparation, adoption, and amendment of an airport land use compatibility plan for each airport in San Diego County." (§ 21670.3, subd. (a).)

By statute, the Authority's airport compatibility plans may be overruled by local agencies that have responsibility for ultimate zoning determinations.  (§ 21676.)  Under section 21676, subdivision (b), "[p]rior to the amendment of a general plan or specific plan, or the adoption or approval of a zoning ordinance or building regulation within the

19

planning boundary established by the [ALUC] pursuant to Section 21675, the local agency" must "first refer the proposed action to the [ALUC]." However, "[i]f the commission determines that the proposed action is inconsistent with the [ALUC]'s plan, the referring agency" is notified and the local agency may then, "after a public hearing, propose to overrule the commission by a two-thirds vote of its governing body if it makes specific findings that the proposed action is consistent with the purposes of this article stated in Section 21670."[10] (§ 21676, subd. (b).) The ALUCP itself also confirms that the local agency retains the final decision making authority for land use determinations within the plan's purview. The document's introduction states that "[a]lthough the ALUC has the sole authority to adopt this Compatibility Plan and to conduct compatibility reviews, the authority and responsibility for implementing the compatibility policies rests with the local agencies that control land uses within the [Airport Influence Area]."[11]

_____

[10]  Section 21670, titled "Establishment of county airport land use commissions" states, in relevant part:  "(a) The Legislature hereby finds and declares that:  [¶]  (1) It is in the public interest to provide for the orderly development of each public use airport in this state and the area surrounding these airports so as to promote the overall goals and objectives of the California airport noise standards adopted pursuant to Section 21669 and to prevent the creation of new noise and safety problems.  [¶]  (2) It is the purpose of this article to protect public health, safety, and welfare by ensuring the orderly expansion of airports and the adoption of land use measures that minimize the public's exposure to excessive noise and safety hazards within areas around public airports to the extent that these areas are not already devoted to incompatible uses."  (§ 21670, subd. (a).)

[11]  The ALUCP defines the Airport Influence Area (AIA) as the ALUC's area of jurisdiction and "is the area where airport-related noise, safety, airspace protection, and overflight factors may significantly affect land use compatibility or necessitate restrictions on certain land uses as determined by the ALUC.  Land use actions that affect property within the AIA are subject to the compatibility policies and criteria in this Compatibility Plan."

Significantly, in the course of Durkin's ownership of Lot 24 and Lot 25 he twice overcame the Authority's findings that his proposed developments were inconsistent with prior versions of the compatibility plan, and obtained permits from the City overruling the Authority and allowing development of the lots. Because the Authority did not have the ability to make the final land use determination at issue in this case, we agree with the trial court that the Authority met its burden on summary judgment to show Durkin could not establish this element of its takings claim and Durkin failed to show there was a triable issue of material fact.

Our conclusion is further bolstered by decisional law addressing takings claims based on the adoption of general land use plans. In *Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110 (*Selby*), the California Supreme Court stated plainly "that the enactment of a general plan for the future development of an area, indicating potential public uses of privately owned land, [does not] amount[] to inverse condemnation of that land." (*Id*. at p. 119.) The court explained that "[i]f a governmental entity and its responsible officials were held subject to a claim for inverse condemnation merely because a parcel of land was designated for potential public use on one of these several authorized plans, the process of community planning would either grind to a halt, or deteriorate to publication of vacuous generalizations regarding the future use of land. [Footnote omitted.] We indulge in no hyperbole to suggest that if every landowner whose property might be affected at some vague and distant future time by any of these legislatively permissible plans was entitled to bring an action in declaratory relief to obtain a judicial declaration as to the validity and potential effect of the plan upon his

21

land, the courts of this state would be inundated with futile litigation." (*Id.* at pp. 120-121; see *Helix Land, supra*, 82 Cal.App.3d at p. 944 ["Moreover, the adoption of a general plan with areas designated for acquisition cannot give rise to a claim for inverse condemnation."].)

The Authority is a distinct legal entity from the County and the cities in which airports are located. Its function is to prepare and adopt land use compatibility plans for each airport in San Diego County. These plans, by statute, serve "[t]o *assist* local agencies in ensuring compatible land uses in the vicinity of all new airports and in the vicinity of existing airports to the extent that the land in the vicinity of those airports is not already devoted to incompatible uses." (§ 21674, subd. (a), italics added.) Like a general plan, the ALUCP is a recommendation subject to variance by the City. Also like a general plan, the ALUCP is an overarching planning document. (*Selby, supra*, 10 Cal.3d at p. 119.) The California Supreme Court has recognized the similarity: "The adoption of an airport land use compatibility plan and the amendment of a general plan are analogous to the extent each 'embod[ies] fundamental land use decisions that guide the future growth and development of cities and counties.' " (*Muzzy Ranch Co. v. Solano County Airport Land Use Com* (2007) 41 Cal.4th 372, 385 (*Muzzy Ranch*).)

The arguments advanced by Durkin to overcome the conclusion that adoption of the ALUCP is not a sufficiently final land use determination to constitute a compensable taking are unpersuasive. First, Durkin asserts that the Authority, not the City, is the decision maker because its jurisdiction preempts that of the local planning agencies. This assertion is contradicted by the statutes that created the Authority. As discussed, the

22

Authority does not have the final say on the development of Lot 24 and Lot 25; under the procedures established by the State Aeronautics Act and the ALUCP itself, the City maintains the ultimate power to determine the fate of a specific property.

Durkin's reliance on *Muzzy Ranch* to state otherwise is misplaced. In *Muzzy Ranch*, the court held that an ALUC's compatibility plan must pass through the review required by the California Environmental Quality Act (CEQA) (Pub. Resources Code, §§ 21000 et seq.). In arguing against imposition of this requirement, the ALUC defendant—the Solana County Airport Land Use Commission (Commission)—asserted its plan was not a sufficiently final land use determination to qualify as an "activity that may cause direct physical change or a reasonably foreseeable indirect physical change in the environment . . . so as to constitute a project" subject to review under CEQA. (*Muzzy Ranch, supra*, 41 Cal.4th at p. 382.) The Commission asserted the freeze in development that could be caused by its plan's purported restriction of residential development to levels currently permitted under existing general plans and zoning regulations was "inherently too speculative to be considered a reasonably foreseeable effect of an [ALUCP]" and "that because the [plan] merely advises the jurisdiction it affects, it cannot be the legal cause of environmental changes that result if the jurisdictions follow its advice." (*Ibid*.)

The *Muzzy Ranch* court rejected these arguments, holding that the fact "[t]hat further governmental decisions need to be made before a land use measure's actual environmental impacts can be determined with precision does not necessarily prevent the measure from qualifying as a project" requiring CEQA review. (*Muzzy Ranch, supra*,

23

41 Cal.4th at p. 383.) In so holding, the court noted that the compatibility plan "carries significant, binding regulatory consequences for local government" in that the local government is required to ensure its general and specific plans are consistent with the ALUC's compatibility plan and any amendment to such plans which affects an area within the compatibility plan must refer proposed action to the ALUC for a consistency determination and any override must still be consistent with the State Aeronautics Act. (*Id*. at p. 384.)

*Muzzy Ranch*'s conclusion that an airport compatibility plan is a sufficiently final project for purposes of triggering CEQA review, however, is not inconsistent with our conclusion that such a plan is not a final land use determination for purposes of establishing a taking. *Muzzy Ranch* itself explains "the definition of project for CEQA purposes is not limited to agency activities that demonstrably *will* impact the environment. ' . . . CEQA does not speak of projects which *will* have a significant effect, but those which *may* have such effect.' " (*Muzzy Ranch, supra*, 41 Cal.4th at p. 383.) In contrast, finality *is* required to adjudicate a takings claim. (See *Calprop Corp., supra*, 77 Cal.App.4th at p. 591 [" '[u]ntil a property owner has 'obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property," "it is impossible to tell whether the land retain[s] any reasonable beneficial use or whether [existing] expectation interests ha[ve] been destroyed" ' "]; *Jones v. People ex rel. Dept. of Transportation* (1978) 22 Cal.3d 144, 151 (*Jones*) ["The adoption of a general plan is considerably short of a firm declaration of an intention to condemn; the plaintiff in an inverse condemnation action must show the invasion of a property right

24

which directly and specially affects him to his injury"].) *Muzzy Ranch*'s holding that CEQA review applies to airport compatibility plans does not lead to the conclusion that such a plan is sufficiently final to show a taking has occurred.[12]

Durkin next contends the Authority itself construes its decisions as binding on the City. In support, Durkin points to three documents: (1) An unsigned resolution of the Authority finding the City's general plan amendment is consistent with the ALUCP; (2) the introductory section of the ALUCP, discussed above, which states that the document "provides compatibility policies and criteria applicable to local agencies in their preparation or amendment of general plans and to landowners in their design of new development;" and (3) a comment letter from the Authority to the City concerning Lot 23, which suggests that the City should prepare an environmental impact report pursuant to CEQA before adopting a statement of overriding concerns. Contrary to Durkin's assertion, none of these documents show that the Authority views the ALUCP as binding on the City and the ALUCP explicitly states otherwise. In sum, we conclude the adoption of the ALUCP by the Authority was not a sufficiently final land use

---

[12] *Muzzy Ranch* also noted the rule "[t]hat the enactment or amendment of a general plan is subject to environmental review under CEQA . . . ." (*Muzzy Ranch, supra*, 41 Cal.4th at p. 385.) As stated, a general plan cannot support a takings claim, reinforcing our conclusion that the finality required to trigger CEQA review is not the same finality required for a takings claim.

determination to support a takings claim.  Thus, the trial court properly found Durkin had not shown a triable issue of material fact on his claims for inverse condemnation.[13]

C

In addition to asserting that the Authority took his property interest by adopting the 2010 ALUCP, Durkin also contends the County should be held liable for the Authority's purported taking because the Authority acted as the County's agent.  Given our conclusion that the adoption of the ALUCP did not constitute a regulatory taking, Durkin's claim that the County is vicariously liable for the Authority's action as its principal is moot.  (*Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175, 1205.)

D

Durkin attempts to make an additional vicarious liability claim based on an indirect beneficiary theory.  He argues the County should be held liable for inverse condemnation as the beneficiary of the Authority's adoption of the ALUCP.  In support Durkin cites two cases:  *People ex rel. Dept. of Transportation v. Diversified Properties Company* (1993) 14 Cal.App.4th 429 (*Diversified*) and *Jones, supra*, 22 Cal.3d 144.  But this theory of indirect liability suffers from the same defect as his regulatory takings claims.  It was the City's decisions to deny his permit application for Lot 25 and preclude

---

[13]  A corollary issue to the finality required to establish a taking is the determination of the governmental actor responsible for compensating the deprived landowner—here the City.  As noted in the introduction, because Durkin did not bring his claims against the City, we have no occasion to address the issue of whether such a claim is viable.

increased occupancy of the Lot 24 building—not the adoption of the ALUCP by the Authority or any action by the County—that arguably resulted in a regulatory taking. Durkin, however, asserts only that the Authority's adoption of the ALUCP decreased the value of his property. Because this action was not a sufficiently final land use determination to support a takings claim, the County cannot be held liable as a beneficiary.

*Diversified* and *Jones* do not support a different conclusion. Both involve claims of precondemnation damages against Caltrans caused by its delay in pursuing condemnation of property it announced was needed for proposed freeway expansions. The theory of recovery is based on the Supreme Court's decision in *Klopping v. City of Whittier* (1972) 8 Cal.3d 39 (*Klopping*). (*Diversified, supra*, 14 Cal.App.4th at p. 440; *Jones, supra*, 22 Cal.3d at p. 150.) In both cases, Caltrans was held responsible for precondemnation damages suffered by the property owners as a result of a local zoning authority's denial of permits based on Caltrans's prior announcements of intent to condemn the property in question. (*Diversified*, at p. 442; *Jones*, at p. 152.)

As we later explain (*post*, pp. 28-33), Durkin has no claim for precondemnation damages on a *Klopping* theory because there is no evidence that anyone announced the County's intent to condemn his property. More importantly for our purposes, *Klopping* as applied in *Diversified* and *Jones* simply does not support a claim for inverse condemnation every time one governmental agency allegedly receives some economic benefit from another agency's otherwise legitimate land use decision.

27

In the end, Durkin's "indirect benefit" theory suffers from the same fundamental flaw as his other theories of inverse condemnation. It is based on the Authority's adoption of the ALUCP, which was not a sufficiently final land use determination to support a takings claim.

## III

### *Precondemnation Conduct*

Durkin's final contention is that his second and fourth causes of action should not have been dismissed because triable issues of fact remain concerning whether the Respondents engaged in unreasonable precondemnation conduct. The Authority responds that the trial court properly concluded the claims are not viable because Durkin failed to provide any evidence of a public announcement of intent to acquire the properties.

### A

"In *Klopping*, the Supreme Court held that the [Fifth Amendment's] 'just compensation' requirement is also triggered where, prior to a taking, 'the condemner acts unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct.' [Citation.] In such circumstances, *Klopping* held, the Constitution also requires that 'the owner be compensated,' and announced the following rule: in an eminent domain action, 'a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior

28

to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value.' " (*Redevelopment Agency of San Diego v. Mesdaq* (2007) 154 Cal.App.4th 1111, 1134, quoting *Klopping, supra*, 8 Cal.3d at pp. 51-52)

The Supreme Court's *Selby* decision, discussed above, clarified the limits of a takings claim based on *Klopping*'s rationale.  "In *Selby*, after the city and county had adopted a general plan indicating the general location of proposed streets, an owner of property depicted as the location through which some of the proposed streets would run brought an action seeking a declaration that there had been a taking under *Klopping*. (*Selby, supra*, at pp. 118-119.)  The court disagreed, holding that '[t]he adoption of a general plan is several leagues short of a firm declaration of an intention to condemn property' because such plans are 'subject to alteration, modification or ultimate abandonment, so that there is no assurance that any public use will eventually be made of [the specified] property.' (*Id*. at pp. 119, 120.)  The court explained that the holding in *Klopping* applied only where the public entity had 'acted unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain proceedings or by other oppressive conduct.' (*Selby*, 10 Cal.3d at p. 119.)"  (*City of Los Angeles v. Superior Court* (2011) 194 Cal.App.4th 210, 224 (*City of Los Angeles*).)  Simply put, the Supreme Court held that the adoption of the general plan at issue in *Selby* was not an announcement of intent to condemn the plaintiff's property.  (*Ibid*.)

"Following *Klopping* and *Selby*, numerous courts have held that a property owner may recover damages under an inverse condemnation theory where the public entity indicates a *firm* intention to acquire his or her property and either unreasonably delays

29

prosecuting condemnation proceedings or commences and abandons such proceedings. [Footnote omitted.] (See, e.g., *Tilem v. City of Los Angeles* (1983) 142 Cal.App.3d 694, 698-699, 708 [city ' "took" . . . [plaintiff's] ability to use his land for a substantial period of time' where it announced a plan to widen road through his property and commenced and abandoned condemnation proceedings]; *Taper v. City of Long Beach, supra*, 129 Cal.App.3d at pp. 602, 615 [plaintiffs entitled to precondemnation damages where their beach property was rendered 'unsaleable and unusable' due to 'widely and publicly disseminated pre-condemnation announcements' and other activities indicating the city intended and desired to acquire the property, such as having the property appraised, applying for a grant to use toward acquisition, and informing plaintiffs' counsel that it would not permit plaintiffs to develop the property]; *People ex rel. Dept. Pub. Wks. v. Peninsula Enterprises, Inc.* [(1979)] 91 Cal.App.3d [332], 341-343, 356 [precondemnation damages awardable where two years prior to initiating condemnation action, entity approached owners regarding possible acquisition of their property, informed owners that acquisition would take place within a year, provided owners a map depicting the property affected, and made an offer of purchase].)" (*City of Los Angeles, supra,* 194 Cal.App.4th at pp. 224-225; italics added.)

B

The trial court found Durkin's claims under *Klopping* failed because he did not show "a triable issue of material fact as to whether [the] Authority made a public announcement of an intention to acquire either property." We agree. In his briefing, Durkin asserts "[t]he ALUCP announces an intent to condemn in the form of direct

30

statements of the intent." This announcement, Durkin argues, precluded his development of Lot 25 and caused the loss of a prospective tenant and limits his ability to garner higher rents on Lot 24.

In support of this claim that the ALUCP was a public announcement of an intent to condemn the property, Durkin cites five documents: (1) the map contained in the ALUCP which shows the Safety Zones around the airport; (2) section 3.4.12 of the ALUCP, which states there is a presumption "that the airport owner owns or intends to acquire property interests—fee title or easements—sufficient to effectuate" its policy of precluding in Safety Zone 1 "most uses, including any new structures and uses having an assemblage of people"; (3) section 2.11.5 of ALUCP, which states that the local zoning authority should require an avigation easement as a condition for approval of projects located in Safety Zone 1; (4) a 2008 letter from the Authority's airport planner Maranda Thompson to Caltrans seeking acceptance of the enclosed ALP for use by the Authority in connection with its "compatibility planning and preparation of the ALUCP"; and (5) definition pages from the ALUCP.

Contrary to Durkin's assertions, these documents do not evidence the announcement of a plan to condemn Durkin's property. With the exception of section 3.4.12 of the ALUCP, which mentions acquisition of property in Safety Zone 1 by the Airport's owner, none of these documents contain any statement, either explicitly or implicitly, concerning acquisition of Durkin's property. Section 3.4.12 of the ALUCP contains a policy statement of the Authority's preference that the Airport's owner acquire property within Safety Zone 1, but it does not direct such action. The provision is also

31

clear that acquisition is not contemplated in all circumstances since it identifies acceptable uses of property "[i]n instances where the affected property is privately owned *and the airport owner does not intend to acquire property interests*." (Italics added.) This provision of the ALUCP is a far cry from the clear announcements of future condemnation found in the cases on which Durkin relies. (See *Klopping, supra*, 8 Cal.3d at p. 42 [City adopted resolution that included list of properties to be condemned to form a new parking district]; *Jones, supra*, 22 Cal.3d at p. 147 ["Department of Transportation [] announced plans to construct a freeway . . . requiring acquisition of two and one-half acres of plaintiffs' land."]; and *Tilem v. City of Los Angeles, supra*, 142 Cal.App.3d at p. 698 [filing of an eminent domain action]).[14]

Durkin's additional argument—that his claims are viable regardless of whether a formal announcement was made because the planning for the airport has transitioned to an acquisition stage—is also not supported by in the record. Durkin states that the County "repeatedly entered into new grant agreements with the FAA wherein it certified that it would acquire interests in all property within the RPZ sufficient to prevent incompatible uses." Durkin states that the County "repeatedly entered into new grant agreements with the FAA wherein it certified that it would acquire interests in all property within the RPZ sufficient to prevent incompatible uses."

_____

14      Durkin also cites *San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517 in support of this proposition. The case, which held the plaintiff *could not* pursue its precondemnation damage claim because it had no compensable property interest at stake, provides no support for Durkin's claim. (*Id*. at p. 532.)

Durkin's only citation, however, is to the County's grant application to the Federal Aviation Administration for funds for the County's Master Plan to "continue the facility planning process described in previous McClellan-Palomar Airport Master Plan Studies (1995-2015), into the next planning period of 2015-2035," which will "define the type and extent of development needed to accommodate the current and future aviation needs as a Federal Aviation Regulation (FAR) Part 139 Certificated National Plan of Integrated Airport Systems (NPIAS) airport." The document contains no reference to acquiring any specific property in connection with planning for the airport.[15] Durkin failed to meet his burden on summary judgment to overcome the Respondents' showing that there was no unreasonable conduct on their part that could support a claim under *Klopping*.

---

[15] Similarly, Durkin asserts that "respondents['] violation of acquisition guidelines is prima facie evidence of unreasonable pre-condemnation conduct" and that "[f]ederal guidelines require prompt acquisition of properties needed for the RPZ, without forcing property owners to bring an action for inverse condemnation." Durkin, however, provides no evidentiary citations to support this claimed wrongful conduct by the County. (See *Citizens For A Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 113 ["[F]ailure to present all relevant evidence on the point 'is fatal.' [Citation.] 'A reviewing court will not independently review the record to make up for appellant's failure to carry his burden.' "].)

## DISPOSITION

The judgment is affirmed.  Respondents are awarded costs of appeal.


DATO, J.

WE CONCUR:


NARES, Acting P. J.


AARON, J.

34

Filed 10/19/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DRYDEN OAKS, LLC et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY et al.,<br><br>    Defendants and Respondents. | D069161<br><br>(Super. Ct. No. 37-2014-00004077-CU-EI-NC)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING, CERTIFYING OPINION FOR PUBLICATION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on September 26, 2017, is modified as

follows:

1.  The paragraphs that start at or near the end of page 32 and continue to the end

of page 33 are replaced with the following four paragraphs:

> Citing *Terminals Equipment Co. v. City and County of San Francisco* (1990) 221 Cal.App.3d 234, 245 (*Terminals Equipment*), Durkin suggests that his claims are viable regardless whether a formal announcement was made because the planning for the airport at some point transitioned to an acquisition phase. While it is true that *Terminals Equipment* allows for the possibility that something less than a "formal announcement" will support a claim for *Klopping* damages, the case does not say that intent alone is sufficient.

1

Indeed, *Terminals Equipment* expressly recognizes that under *Klopping*, the intent to condemn must in some way be communicated to the public so as to cause a diminution in the value of the property. (221 Cal.App.3d at p. 245, citing *Klopping, supra,* 8 Cal.3d at p. 52.)

There are several problems with Durkin's theory as applied to the facts of this case. He relies primarily on the County's 1995 FAA grant application seeking funds to acquire Lots 24 and 25 and a March 1996 letter requesting authorization to use the grant funds for purposes other than acquisition of the property. These documents fall short of demonstrating a publicly communicated unequivocal intent to acquire the property. Rather, they represent a desire to explore possible purchase of the lots if it proved feasible. (See *Terminals Equipment, supra,* 221 Cal.App.3d at p. 246.) Durkin's own evidence shows it was not feasible. Negotiations with Durkin's predecessors in interest proved fruitless, and rising land prices meant that any purchase would exceed the amount of the grant, thus making it impractical.

Interest in purchasing property if an acceptable price can be agreed upon is a far cry from an unequivocal intent to acquire. Moreover, even if the 1995 FAA grant application somehow rose to the level of actual intent to condemn the property, the very documents relied on by Durkin show that any intent on the County's part was short-lived. By March 1996, five years before Durkin purchased the two lots, the County abandoned any plan or interest in acquiring Lots 24 and 25. If there was any artificial effect depressing the price of the two lots, it was necessarily transitory and had long dissipated by the time Durkin acquired his interest in the properties.

Durkin also cites the County's 2013 grant application to the Federal Aviation Administration for funds for the County's Master Plan to "continue the facility planning process described in previous McClellan-Palomar Airport Master Plan Studies (1995–2015), into the next planning period of 2015–2035," which will "define the type and extent of development needed to accommodate the current and future aviation needs as a Federal Aviation Regulation (FAR) Part 139 Certificated National Plan of Integrated Airport Systems (NPIAS) airport." The document, however, contains no reference to acquiring any specific property in connection with planning for the airport. Durkin thus failed to meet his burden on summary judgment

2

to overcome Respondents' showing that there was no unreasonable conduct on their part to support a claim under *Klopping*.

2. In the final paragraph of the modified language prior to the disposition, in the second sentence after "any specific property in connection with planning for the airport," insert footnote 15 as follows:

> Similarly, Durkin asserts that "respondents['] violation of acquisition guidelines is prima facie evidence of unreasonable pre-condemnation conduct" and that "[f]ederal guidelines require prompt acquisition of properties needed for the RPZ, without forcing property owners to bring an action for inverse condemnation." But he provides no evidentiary citations to support this claimed wrongful conduct by the County. (See *Citizens For A Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 113 ["[F]ailure to present all relevant evidence on the point 'is fatal.' [Citation.] 'A reviewing court will not independently review the record to make up for appellant's failure to carry his burden.' "].) In his reply brief, Durkin also points to a 2005 FAA grant agreement in which the County represented that it will acquire "fee title or less than fee interest in the Runway Protection Zones for runways that presently are not under its control within 10 years of this Grant Agreement." Durkin did not raise this argument in his opening brief and we decline to address it. (See *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830. [" 'A contention made for the first time in an appellant's reply brief, unaccompanied by any reason for omission from the opening brief, may be disregarded.' "].)

Appellants' petition for rehearing is denied.

There is no change in judgment.

The opinion in the above-entitled matter filed on September 26, 2017 was not certified for publication in the Official Reports. As the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), it is ordered that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion be published in the Official Reports.

3

NARES, Acting P. J.

Copies to:  All parties

4