Filed 12/26/23  Simmons v. EHM Architecture CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COURT OF APPEAL, FOURTH APPELLATE DISTRICT

# DIVISION ONE

# STATE OF CALIFORNIA

| | |
|---|---|
| ROBERT SIMMONS, | D080702 |
| Plaintiff, Cross-defendant and Appellant, | |
| v. | (Super. Ct. No. 37-2018-00024067-CU-BC-CTL ) |
| EHM ARCHITECTURE, INC., | |
| Defendant, Cross-complainant and Respondent; | |
| RANDAL EHM, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald F. Frazier, Judge.  Affirmed.

Sepahi Law Group and Sage S. Sepahi; Haight Brown & Bonesteel, Arezoo Jamshidi and Elizabeth A. Evans for Plaintiff, Cross-defendant and Appellant.

Lewis Brisbois Bisgaard & Smith, and Jeffry A. Miller, Ernest Slome, Jamison A. Rayfield and Tracy Forbath; Law Office of Kurt W. Hallock and Kurt W. Hallock; for Defendants, Cross-complainant and Respondents.

## I. INTRODUCTION

Plaintiff and cross-defendant Robert Simmons and defendant and cross-complainant Ehm Architecture, Inc. (Ehm) entered into an agreement for architectural and engineering services. The relationship soured, culminating in an action by Simmons against Ehm and its CEO, Randal Ehm (Randal),[1] and a subsequent cross-action by Ehm against Simmons. After a trial, the jury found in favor of Ehm on all of its cross-claims, awarding $46,000 in damages on Ehm's cause of action for receiving stolen property under Penal Code section 496.[2]

In this appeal, Simmons seeks to reverse the verdict on four grounds. First, Simmons contends that he cannot be liable because section 496 creates a cause of action against a "person who buys or receives any *property* that has been stolen," (§ 496, subd. (a), italics added) and his actions did not involve Ehm's "property," only its "labor." Second, Simmons claims that the trial court improperly instructed the jury with respect to the requisite intent for section 496 liability. Third, Simmons argues that the verdict is not supported by sufficient evidence. Finally, Simmons claims that the court erred by refusing to exclude evidence of collateral agreements or oral requests for additional services. He claims claiming that such evidence was inconsistent with Ehm's denial that there were any collateral agreements between the

---

[1]     Randal, although named as a defendant, did not join in the cross-complaint that is the subject of this appeal.

[2]     Further undesignated statutory references are to the Penal Code.

parties and that oral requests for additional services were not permitted under the contract.

Finding no reversible error on any ground raised by Simmons, we affirm.

## II.  BACKGROUND

A.  *Factual History*

In June 2017, Simmons hired Ehm to design an addition connecting his house to his mother's house next door.  Under their contract, Ehm agreed to "[p]rovide architectural and engineering services for consolidation of two legal lots, and design for permitting and construction of a 1-story, approximately 500 [square foot] addition to connect the existing houses and provide a storage room at the back of [Simmons's] mother's house, with a new 'castle-style' façade structure extending from [his] existing garage to the southeasterly corner of [his] mother's house."  (Capitalization omitted.) The parties agreed to a flat fee of $31,000 for "basic services," including measurements and drawings of the existing structure, and architectural and engineering plans for the proposed addition.  (Some capitalization omitted.) Simmons agreed to pay a deposit of $4,200 upon signing and to pay the balance through progress payments due over the course of the project.

Under the contract, "additional services" not included in the basic services would be provided at Ehm's "standard hourly rates" laid out in the agreement.  (Some capitalization omitted.)  Specifically, the contract states that additional services "described under paragraphs 3.2 and 3.4 shall only be provided if authorized or confirmed in writing by the owner.  If services in paragraph 3.3 are required due to circumstances beyond the architect's control, the architect shall notify the owner prior to commencing such services.  If the owner deems that such services described under paragraph

3

3.3 are not required, the owner shall give prompt written notice to the architect.  If the owner indicates in writing that all or part of such contingent additional services are not required, the architect shall have no obligation to provide those services."  (Some capitalization omitted.)

"Contingent additional services" described under paragraph 3.3 include "[m]aking revisions in drawings, specifications or other documents when such revisions are . . . inconsistent with approvals or instructions previously given by the owner, including revisions made necessary by adjustments in the owner's program or project budget," and "[p]roviding services required because of significant changes in the project including, but not limited to size, quality, [or] complexity."  (Some capitalization omitted.)

Article 6, "use of architect's drawings, specifications and other documents," states:

"The drawings, specifications and other documents prepared by the architect for this project are instruments of the architect's service for use strictly with respect to this project and, unless otherwise provided, the architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright.  The owner shall be permitted to retain copies, including reproducible copies, of the architect's drawings, specifications and other documents for information and reference in connection with the owner's use and occupancy of the projects.  The architect's drawings, specifications and other documents shall not be used by the owner or others on other projects, for additions to this project or for completion of this project by others . . . except by agreement in writing and with appropriate compensation to the architect."  (Some capitalization omitted.)

4

The scope of the project changed significantly after the contract was signed. Simmons asked to increase the height of the project, changing it from a "1-story" addition to include a 30-foot turret. The change in height necessitated a change to the building structure (from wooden beams to steel beams), which Randal testified "affected almost every drawing in the set." Simmons asked to change the material for the faux-castle façade from stucco to stone and requested gothic-style windows, rather than standard rectangular ones. Randal testified that the scope changed with respect to 27 items based on requests "often made in person at meetings." The scope of Ehm's services also changed from a "design-build scenario" to a "design bid-build-scenario," which required Ehm to produce a more detailed set of drawings before involving a contractor.

In September 2017, Randal met with Simmons and told him that the project and scope of work had changed considerably. According to Randal, Simmons offered to pay the balance of the $31,000 flat fee for basic services, and they agreed to move forward with the project and "settle up" once the full cost was known.

In March 2018, Simmons began corresponding directly with Ehm's engineering consultant for the project, Clifford Denmark, without Ehm's knowledge. Ehm's expert opined that, in his experience, this kind of direct client-consultant communication was "highly unusual." In mid-April, in response to Simmons's request for a full set of plans for the project, Randal responded:

"We typically do not release full sets of prints when a project is so far over budget. At the moment, we own more of the plans than you do, so at the very least they are not yours but 'ours.' [¶] In a final act of good faith, as we have done so many time [*sic*] before on your behalf, we will release one set to

5

you, which you can pick up from Michael.  As previously mentioned, we will not be performing any more work until the bids are in and we have a compensation meeting, with a fair and reasonable settlement and payment prior to resumption of services.  [¶]  We have bent further over backward for you on this project than we have ever done, and we simply cannot afford—nor should we be expected to—provide you with any more unpaid services.  We have paid our employees out of hard-earned funds on either [*sic*] projects, so not only have we not mode a dime on your project, we have paid out of pocket just to keep it moving forward.  We have done so for at LEAST 7 or 8 months, since I first advised you that we were 'underwater' on the budget.  Considering that you did not know the cost of the project, and understanding that we would have to advance the plans to a biddable set before that could occur, I agreed to proceed, but I advised you at that time that there would have to be a reckoning when costs are known. We are rapidly approaching that juncture.  The structural change from wood to steel has been primarily responsible for the overruns, but the dramatic increase in scope beyond what was anticipated and budgeted is also a factor.  Another factor was the extensive 3D modeling we did, some of our own volition early on but much at your request, the latter of which is an additional service under our contract.  [¶]  I sincerely hope and trust that you will appreciate all that we have done for you to date, and that you will be fair as we negotiate an equitable fee adjustment." (Some capitalization omitted.)  Simmons did pick up a set of prints, but Ehm and Simmons never engaged in a "compensation meeting."

Instead, on April 27, 2018, Simmons (through counsel) sent a letter demanding that Ehm either refund his $31,000 payment or "release the plans/intellectual property you or anyone else prepared concerning the project, identify by name, address, and phone number the leads for the bids

6

you obtained for contractors who intended to perform work on the project, and notify the City that Mr. Simmons or his designee may serve as the point of contact for the permit he purchased." Ehm then stopped work on the project. Ehm did not refund Simmons's money or agree to Simmons's other demands.

In the meantime, on April 25, 2018, Simmons arranged a meeting with a new design firm, HyR Building, LLC, (HyR) and Denmark, the engineering consultant originally hired by Ehm. The next day, Simmons asked HyR and Denmark "to get started Monday morning." The HyR contract, signed May 7, 2018, provided that the new firm was to complete the project, and stated that HyR would "verify drawings" and "begin corrections." (Some capitalization omitted.) Simmons shared Ehm's plans with HyR, and, according to Simmons, gave "a verbal instruction" not to copy them. On May 16, 2018, HyR sent Simmons an e-mail that included some drawings of the project and stated they would "be removing about 10 pages of nonsense from the set." Ehm's expert witness testified that a set of design documents prepared by HyR looked like it was "the same" as Ehm's, only with a different "title block," concluding that "basically [the drawings] were copied."

Ultimately, Ehm calculated the value of the contingent additional services, based on the hourly rates in the contract, at $77.101.25. Ehm's expert witness opined that this was a conservative estimate, and testified that the cost to Ehm of employee salaries alone on the project was over $60,000. Simmons never paid Ehm more than the $31,000 for basic services.

B. *Procedural History*

Simmons filed a lawsuit asserting a number of causes of action against Ehm and Randal (together, Defendants), including breach of contract, false promise, conversion, elder abuse, and consumer legal remedies. Ehm filed a

7

cross-complaint, alleging breach of contract, conversion, and violation of section 496.

Before trial, Simmons filed two very similar motions in limine seeking to exclude (1) "evidence related to any alleged oral requests for, or oral agreements to pay for, 'additional services,' " and (2) "evidence related to any alleged oral agreements between the parties." (Emphasis omitted.) Simmons claimed, among other things, that this evidence was irrelevant and prejudicial because defendants had denied the existence of oral contracts in their discovery responses and oral agreements were not permitted under the terms of the parties' written contract. Defendants responded that, under the contract, contingent additional services did not need to be requested in writing, and thus evidence of oral requests for additional services were relevant. The court held a hearing and denied the motions, issuing an unreasoned minute order.

After an eight-day trial, a jury found that Simmons had breached the contract, committed conversion, and violated section 496, subdivision (a). The jury awarded $46,000 in damages on the section 496, subdivision (a) cause of action and $0 on the other two causes of action. The jury rejected each of Simmons's claims, awarding him no damages.

Simmons filed a motion for judgment notwithstanding the verdict and a motion for a new trial on substantially similar grounds, arguing that substantial evidence did not support the jury's finding that he violated section 496 or that Ehm suffered damages and that section 496 did not apply because Ehm's claim involved "labor" rather than "property." Following a hearing, the court denied both motions. Simmons appeals.

8

# III. DISCUSSION

## A. *Cause of Action for Violating Section 496*

Simmons challenges the verdict on section 496 on several grounds. First, he contends that his actions could not possibly fall within the scope of the statute because misappropriation of Ehm's plans constituted theft of "labor and services" rather than "property" for purposes of the statute. Second, he contends that the court improperly instructed the jury with respect to the requisite intent. Third, he contends that there was insufficient evidence supporting the jury's verdict. We reject each argument in turn.

### 1. *Ehm's Documents Constituted "Property" under Section 496*

Section 496 creates a cause of action against a "person who buys or receives any *property* that has been stolen." (§ 496, subd. (a); italics added.) Simmons contends that the trial court improperly denied his motion for judgment notwithstanding the verdict, arguing that his actions did not involve Ehm's "property," only its "labor," and he therefore cannot be liable.

#### a. *Standard of Review*

"We review de novo a judgment notwithstanding the verdict applying the same legal standard as the trial court . . . ." (*Reynolds v. Lau* (2019) 39 Cal.App.5th 953, 962.) "A [judgment notwithstanding the verdict] must be granted where, viewing the evidence in the light most favorable to the party securing the verdict, the evidence compels a verdict for the moving party as a matter of law." (*Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1194.)

b. *Analysis*

Relying exclusively on *Lacagnina v. Comprehend Systems, Inc.* (2018) 25 Cal.App.5th 955 (*Lacagnina*), Simmons argues that Ehm only lost the " 'value of [its] services,' " and that it is "knowledge and skill that Simmons is alleged to have stolen by virtue of using the plans." Simmons claims that, under *Lacagnina*, this kind of property does not fall within the auspices of section 496.

Simmons misunderstands *Lacagnina,* in which the court specifically "reject[ed] [the] contention that an employee who recovers a judgment against an employer for lost compensation has suffered a 'theft' of 'labor'." (*Lacagnina*, *supra*, 25 Cal.App.5th at p. 958.) The plaintiff in *Lacagnina* expressly and exclusively argued that his employer stole his "labor" from him, abandoning an earlier theory that the employer had stolen his "contacts, industry knowledge, and other trade secrets." (*Id*. at pp. 964-65.) Indeed, the court distinguished the issue before it from cases involving "personal property, whether tangible or intangible" (*id*. at p. 970), including a "Personal Identification Number (PIN) code used to access bank automatic teller machines" (*People v. Kozlowski* (2002) 96 Cal.App.4th 853, 864-869), trade secrets (*People v. Gopal* (1985) 171 Cal.App.3d 524, 541), and a warrant (*People v. Norwood* (1972) 26 Cal.App.3d 148, 157). (*Lacagnina*, *supra*, 25 Cal.App.5th at p. 970.) *Lacagnina* does not hold that theft of intangible or intellectual property falls outside section 496 and has no bearing on the property at issue.[3]

---

3    We further note that the Supreme Court criticized *Lacagnina*'s analysis of section 496 in other respects and stated: "The present case does not pose whether wage theft might give rise to a claim for treble damages under section 496[, subdivision] (c). We express no view concerning whether *Lacagnina*[, *supra*, 25 Cal.App.5th 955,] correctly distinguished between the

10

Simmons cannot reasonably dispute that the plans are tangible property that contained valuable information. (Cf. *Civic Partners Stockton, LLC v. Youssefi* (2013) 218 Cal.App.4th 1005, 1017 [explaining, in action for conversion of architectural plans, that plaintiff was "suing for conversion of a particular object on which the copyrighted work is embodied"].) In straining to characterize the plans as "labor," Simmons contends there was no evidence that the plans had "an intrinsic value apart from the labor, services and knowledge that went into creating them." Among other shortcomings, this argument conflates valuation of the plans with whether they are property at all.[4] The trial court properly denied Simmons's motion for judgment notwithstanding the verdict on this point.

2. *There Was No Reversible Instructional Error*

Simmons contends that the jury was instructed incorrectly with respect to the intent element of section 496. The instructions provided:

"SPECIAL INSTRUCTION NO. 2

PENAL CODE SECTION 496.

Ehm Architecture, Inc. claims that Robert Simmons violated California Penal Code Section 496. To establish this claim, Ehm Architecture, Inc. must prove all the following:

theft of labor or services and the theft of other intangible property." (*Siry Investment, L.P. v. Farkhondehpour* (2022) 13 Cal.5th 333, 352, fn. 14, 353 (*Siry*).)

[4] If Simmons is alluding to the fact that architectural plans for a bespoke addition are useful only to the person who commissioned them, this only means that such plans may lack value on the open market, not that they are incapable of being valued. (See, e.g., *Williams v. Chittenden Trust Co.* (1984) 145 Vt. 76, 84 ["We think the correct measure of damages for conversion of architectural plans . . . is the cost to the architect of producing those plans."].)

11

1. That Mr. Simmons took, received or concealed Ehm Architecture, Inc. 's proprietary design documents dated April 9, 2018;

2. That Ehm Architecture, Inc.'s proprietary documents were obtained by Mr. Simmons in a manner constituting theft as defined elsewhere in these instructions; and

3. That Mr. Simmons' conduct was a substantial factor in causing injury to Ehm Architecture, Inc.

. . .

[SPECIAL INSTRUCTION] #4

Mr. Simmons committed theft if he took possession of Ehm Architecture, Inc.'s proprietary design documents without Ehm Architecture, Inc.'s consent, or if he fraudulently obtained or appropriated Ehm Architecture, Inc.'s proprietary design documents. A person fraudulently obtains proprietary design documents, if he obtains the documents by false pretense.

Every person who knowingly and designedly by false or fraudulent representation or pretense, defrauds another person of money, labor, real or personal property, commits a theft by false pretense."

Simmons argues that these instructions were erroneous in light of the Supreme Court's decision in *Siry, supra*, 13 Cal.5th 333, which Simmons claims changed the intent required for section 496 liability. He claims that the jury instructions directed the jury to find him liable if he merely took possession of Ehm's plans without consent, which is insufficient to establish the criminal culpability required under this statute.

a. *Standard of Review*

We review a challenge to a jury instruction de novo. (*Collins v. County of San Diego* (2021) 60 Cal.App.5th 1035, 1055.) "[A]n appellant must

demonstrate that any alleged error in the jury instructions was prejudicial, i.e., that it was probable the appellant would have achieved a more favorable result without the error." (*Ibid.*)

              b.    *Analysis*

In *Siry*, our Supreme Court addressed "whether a trial court may award treble damages and attorney's fees under [ ] section 496, subdivision (c) in a case involving, not trafficking of stolen goods, but instead, fraudulent diversion of a partnership's cash distributions." (*Siry, supra*, 13 Cal.5th at p. 339; footnote omitted.) In the course of its analysis, the Court briefly discussed intent: "We pause to elaborate on these points, and, specifically, criminal intent under the statute. Because this litigation comes to us upon default judgment, defendants are deemed to have admitted all material allegations, including the allegation that defendants committed theft. Although we are not asked here to determine whether plaintiff would have been able to prove theft, we observe that not all commercial or consumer disputes alleging that a defendant obtained money or property through fraud, misrepresentation, or breach of a contractual promise will amount to a theft. To prove theft, a plaintiff must establish criminal intent on the part of the defendant beyond "mere proof of nonperformance or actual falsity." [Citation.] This requirement prevents ' "[o]rdinary commercial defaults" ' from being transformed into a theft. [Citation.] If misrepresentations or unfulfilled promises 'are made innocently or inadvertently, they can no more form the basis for a prosecution for obtaining property by false pretenses than can an innocent breach of contract.' [Citation.] In this case, the record appears consistent with a conclusion that defendants acted not innocently or

inadvertently, but with careful planning and deliberation reflecting the requisite criminal intent." (*Siry*, at pp. 361-362.)

Simmons contends that *Siry* "uniquely clarified the criminal intent required under [ ] section 496," rendering the jury instructions in this case inadequate in light of a purported new standard. However, the excerpt above is the entirety of the Court's analysis with respect to state of mind, and it merely observes that the statute requires that a "theft" occurred and, thus, liability cannot extend to innocent or inadvertent commercial defaults. (*Siry, supra*, 13 Cal.5th at p. 362.) The statutory language makes that much clear, providing that treble damages are available to someone "who has been injured by a violation of subdivision (a)." (§ 496, subd. (c).) Subdivision (a) makes it a crime to, among other things, "buy[ ] or receive[ ] any property that has been stolen or that has been obtained in any manner constituting theft or extortion." (§ 496, subd. (a).) It was well established at the time of this trial that a "theft" requires criminal intent, as underscored by *Siry*'s reliance on a 70-year-old case, *People v. Ashley* (1954) 42 Cal.2d 246, for that proposition. (*Siry, supra*, at p. 362.) Contrary to Simmons's arguments, *Siry* did not change the law in this regard.

Nonetheless, Simmons correctly points out that the jury instruction was wrong in one respect, instructing that Simmons "committed theft if he took possession of Ehm Architecture, Inc.'s proprietary design documents without Ehm Architecture, Inc.'s consent." Mere taking without consent is only trespass; theft requires criminal intent. (See, e.g., *People v. Davis* (1998) 19 Cal.4th 301, 305; *People v. Ashley, supra*, 42 Cal.2d at p. 259.)

However, instructional error is only reversible if " ' "it seems probable that the jury's verdict may have been based on the erroneous instruction." ' " (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) "That assessment,

14

in turn, requires evaluation of several factors, including the evidence, counsel's arguments, the effect of other instructions, and any indication by the jury itself that it was misled." (*Ibid.*) This record reflects that the error was harmless.

The instruction says that Simmons committed "theft" if he took the plans without consent *or* if he obtained the plans by false pretense. The verdict form, however, only asked the jury to find whether Simmons obtained the plains by false pretense. In question No. 44, the jury was asked to determine whether Simmons "obtain[ed] Ehm Architecture, Inc.'s proprietary Design Documents dated 19 April 9, 2018 *by false pretense*." (Italics added.) Similarly, in question No. 43, the jury was asked, "What is the amount of monetary damage Ehm Architecture, Inc. suffered as a result of Robert Simmons' [sic] obtaining Ehm Architecture, Inc.'s design documents?" With respect to false pretense, the jury instructions that Simmons agreed to encompassed an appropriate intent standard, stating: "Every person who knowingly and designedly by false or fraudulent representation or pretense, defrauds another person of money, labor, real or personal property, commits a theft by false pretense."[5]

Furthermore, the jury asked during deliberations, "Can you define false pretense as stated in question number 44" of the verdict form. Per the court's recommendation, and the parties' agreement, the jury was told "please refer to the second paragraph of [special instruction] number four." The jury's

[5] To the extent Simmons argues the definition of false pretense was incorrect, he invited the error, if not by agreeing to the definition before it was given, then certainly by confirming it was appropriate in response to the juror's question about the meaning of false pretenses, stating, "That's the definition, yes." (See *Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 592 [" 'The doctrine of invited error bars an appellant from attacking a verdict that resulted from a jury instruction given at the appellant's request.' "].)

15

verdict could not have been affected by the general definition of theft because it was exclusively tasked with analyzing false pretenses when rendering its verdict.

In addition, Ehm conceded that it gave the plans to Simmons. Indeed, Simmons contends that "[t]he evidence presented to the jury establishes unequivocally that [Ehm] voluntarily provided Simmons with the plans." There is simply no reasonable possibility that the jury relied on the "without consent" portion of the instruction. (See *Clark Bros., Inc. v. North Edwards Water Dist.* (2022) 77 Cal.App.5th 801, 820 [no prejudice where the evidence would not have supported verdict based on an erroneous instruction].) There is, thus, no reversible error.

3. *The Verdict Is Supported by Substantial Evidence*

Simmons argues that there was insufficient evidence to support the jury's verdict. First, Simmons claims that the jury could not reasonably find that he had the requisite intent at the time he obtained Ehm's plans. Second, he contends that there was no evidence Ehm's plans were actually used by Simmons in connection with the new design firm's work. Third, he claims that there is no evidence Ehm suffered any injury as a result of his misappropriation of the plans.

a. *Standard of Review*

"On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.) "If there is, we must affirm the denial of the motion." (*Ibid.*) "Substantial evidence is evidence of ponderable legal significance that is reasonable in nature, credible, and of solid value." (*Holden v. City of San Diego* (2019) 43

16

Cal.App.5th 404, 410.) "If . . . 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631 (*Howard*).) " 'The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record.' " (*Graciano v. Mercury General Corp.* (2014) 231 Cal.App.4th 414, 427.)

    b. *Analysis*

     i. *Evidence of Simmons's Intent*

  Simmons claims that he cannot have had the requisite intent to commit theft by false pretenses because (a) Ehm did not provide him with a total cost of the contingent additional services, (b) Simmons reasonably "believe[d] he had reached an impasse with defendants regarding finishing the project by the time he showed the plans to any other design firm," and (c) "Simmons had already shown the plans to the second design firm and the alleged damage, so to speak, already incurred long before defendants provided any actual amount of compensation for the additional services." (Some capitalization omitted.)

  In fact, Simmons undeniably took the plans knowing that Ehm had requested compensation for additional services. The record supports a reasonable inference that Simmons took the plans intending to use them to complete the project with Denmark and HyR, and that he knew this was a violation of the plain terms of his contract with Ehm. This is sufficient to show that he acted "knowingly and designedly" in fraudulently obtaining the plans.

  Testimony and evidence presented at trial supported that Simmons requested significant changes to the project that triggered a need for contingent additional services. Evidence further supports that Ehm informed

17

Simmons that the changes to the scope and complexity of the project had resulted in significant additional costs and that Ehm expected fair compensation. This culminated in Randal agreeing to release a set of plans to Simmons "[i]n a final act of good faith," accompanied with a request for a "compensation meeting" and request for "a fair and reasonable settlement and payment." In the same e-mail, Randal noted, "we typically do not release full set of prints when a project is so far over budget," and stated, "we own more of the plans than you do, so at the very least they are not yours but 'ours.'" Simmons took a copy of the plans in mid-April 2018, but never agreed to a compensation meeting and never paid Ehm for contingent additional services.

Rather, the evidence reasonably supports the inference that Simmons was already planning to complete the project with a new team, as he had taken the "highly unusual" step of unilaterally communicating with Denmark, Ehm's engineering consultant by March 2018, before he requested the plans from Ehm. Simmons met with new design firm HyR and Denmark and asked them to begin work completing the project before he told Ehm he did not intend to continue working with them. It is undisputed that Simmons shared Ehm's plans with HyR and, as discussed below, the evidence supports that HyR actually used them in its work on the project. A jury could reasonably conclude from this evidence that, at the time he took the plans from Ehm, Simmons intended to use the plans to complete the project with other parties and without further compensating Ehm.

The contract with Ehm Architecture provides that the plans are Ehm's intellectual property and cannot be "used for completion of this Project by others." Ehm's e-mail reminded Simmons that Ehm owned the plans. A jury

18

could thus fairly conclude that Simmons knew that he was not permitted to use the plans without Ehm's consent.

ii.     *Evidence of Simmons's Use of the Plans*

Simmons contends there is no evidence that he "used" the plans in violation of his agreement with Ehm.  However, the record contains sufficient evidence to support the conclusion that Simmons gave the plans to HyR and used them to complete the project.

Simmons concedes that he showed the plans to the new design firm shortly after he obtained them from Ehm.  Pursuant to Simmons's contract with HyR, signed on May 6, 2018, the new firm was to "verify drawings" and "begin corrections."  (Some capitalization omitted.)  In an e-mail to Simmons, an HyR designer said they would "be removing about 10 pages of nonsense from the set."  Ehm's expert witness testified that the drawings from HyR were "the same" as Ehm's, only with a different "title block."  He explained "basically they were copied."

Simmons argues that it is not reasonable to infer from the contract with the new designer that the firm's mandate to "verify drawings" and "begin corrections" referred to Ehm's plans.  He makes the same argument with respect to HyR purporting to "remov[e] about 10 pages of nonsense from the set."  However, Simmons does not explain what other "drawing[s]" or "set" existed at that time to be "correct[ed]" or culled.  It is reasonable to infer that these were references to Ehm's plans.  (Some capitalization omitted.)

Simmons also contends that Ehm's expert testimony can be disregarded as "speculative" and "conclusory," claiming that the expert "was not asked to compare the two sets of plans" or "asked to explain what led him to conclude . . . [Ehm's] plans had been used."  That is not supported by the record.  The expert testified that it "look[ed] like" the plans had been taken

19

from Ehm from what he "could see," and that "the drawings are the same." A jury could reasonably infer that he drew his conclusions from a visual comparison of the drawings. His opinion therefore has a clear factual and logical basis and constitutes substantial evidence.

Finally, Simmons points to evidence (his own testimony) that he orally instructed the new design team not to copy Ehm's plans. However, in light of the substantial evidence supporting the verdict, contradictory evidence is of no moment. (See, e.g., *Howard, supra*, 72 Cal.App.4th at 631.)

### iii. *Evidence that Ehm Sustained Damages*

Simmons contends that there is no evidence that Ehm sustained any injury as a result of his violation of section 496. Ehm presented evidence that the cost of additional services—and thus to produce the project plans as they existed when Simmons misappropriated them—was $77.101.25. The jury awarded $46,000, which is approximately $77.101.25 less the amount Simmons paid Ehm, $31,000. Simmons does not dispute that Ehm presented substantial evidence demonstrating the value of the additional services, conceding that $46,000, "may have been the proper measure of damages on the breach of contract cause of action."

Rather, Simmons appears to contend that Ehm's only evidence of damages established the cost of producing the plans and suggests that loss of that amount was "caused by" Simmons's refusal to pay under the contract, not his misappropriation of the plans. But the same could have been said in *Siry*, where the cause of plaintiff's injury was defendant's diversion of partnership funds in contravention of the partnership agreement. (See *Siry, supra*, 13 Cal.5th at pp. 339-40.) In other words, just as Ehm might have been entitled to recover the value of its services under another theory, the plaintiff in *Siry* would have been entitled to recover the misappropriated

20

partnership profits even if the defendants had not violated section 496, subdivision (a). The Court nonetheless concluded that "[d]efendants' violation of section 496(a) caused plaintiff to suffer actual damage, loss, or harm." (*Siry,* at p. 362.)

We similarly conclude that there is evidence that Simmons's violation of section 496, subdivision (a), caused Ehm to suffer actual harm. As discussed above, the evidence supports that Simmons knew the plans were given to him with the expectation that Ehm would receive payment for contingent additional services. By misappropriating the plans for use with another firm, Simmons deprived Ehm of the opportunity to obtain the fair value of those plans, as measured by the cost to produce them. Simmons thereby misappropriated a thing of value, Ehm undisputedly submitted substantial evidence of the value of that thing, and the jury's damages award bears a reasonable relationship to that evidence. The damages award is supported by substantial evidence.[6]

---

[6] Simmons contends in a footnote that "the findings on damages in the special verdict form were . . . contradictory" because the jury "awarded breach of contract damages instead of [ ] section 496 damages on the section 496 cause of action." To the extent Simmons intended to present a separate argument premised on contradictory jury findings or CACI 3934, he has forfeited it by failing to present his point under a separate heading. (*Bitner v. Department of Corrections & Rehabilitation* (2023) 87 Cal.App.5th 1048, 1065 [" 'Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading.' "].) In any case, although he refers to the purportedly "improper[ ]" use of CACI 3934 in the instructions, Simmons concedes that "CACI 3934 was not contested or discussed in any posttrial briefing and is thus not at issue before this court."

B.    *The Trial Court Did Not Err by Denying Simmons's Motions in Limine*

Simmons contends the trial court erred by denying motions in limine seeking to exclude (1) "evidence related to any alleged oral requests for, or oral agreements to pay for, 'additional services' "; and (2) "evidence related to any alleged oral agreements between the parties."  Simmons contends that the parties' contract provides that "any amendments or changes thereto must be in writing" and that paragraphs 3.2 and 3.4 specifically state that "additional services" under these provisions must be requested in writing.  He therefore claims that it was error to admit evidence of "oral discussions between Simmons and" Ehm, including evidence of "additional services allegedly requested by Simmons [that] were never reduced to a writing."  Ehm argues that admitting "evidence of oral requests or requirements to provide contingent additional services was proper" because "[t]he parties' agreement did not require contingent additional services [under paragraph 3.3] to be requested or required in writing."

1.    *Standard of Review*

We can only reverse if Simmons establishes that the trial court abused its discretion.  (*Hernandez v. Paicius* (2003) 109 Cal.App.4th 452, 456.)[7]  "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason."  (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478.)  "The trial court's authority is particularly broad 'with respect to rulings that turn on the relevance of the proffered evidence.' "  (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 296.)  "It is for the trial court, in its

---

[7]    Simmons contends we should review the trial court's denials de novo, claiming that interpretation of a contract is a purely legal question.  However, because Simmons does not actually disagree with Ehm's interpretation, the meaning of the contract is not in dispute.

discretion, to determine whether the probative value of relevant evidence is outweighed by a substantial danger of undue prejudice." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 596.) We may not interfere with such a determination "unless the trial court's determination was beyond the bounds of reason and resulted in a manifest miscarriage of justice." (*Ibid.*)

2. *Analysis*

Simmons does not and cannot dispute that, under paragraph 3.3 of the contract, contingent additional services were not included in the $31,000 flat-fee charged for basic services and did not need to be requested in writing. In contrast to additional services under paragraphs 3.2 and 3.4, which "shall only be provided if authorized or confirmed in writing by the owner," the contract provides that contingent additional services under paragraph 3.3 required only "notice" of any kind to Simmons. (Some capitalization omitted.) In fact, the contract required Simmons to put in writing if he did not think contingent additional services were required. The jury therefore did not need to conclude that there was an oral modification of the contract or collateral agreements to conclude that Ehm was owed additional payment for its services. Nor did the jury need to conclude that additional services were provided under sections 3.2 or 3.4 of the contract. Thus, evidence of at least some oral requests for services was relevant to the parties' dispute. Because the contract contemplated oral requests for contingent additional services, the trial court did not abuse its discretion by concluding that evidence of oral requests for services were relevant to the dispute.

In his reply brief, Simmons argues for the first time that Ehm has not proven that *all* of the requested services constitute contingent additional services or that Ehm followed a condition precedent requiring Ehm to "inform him of contingent additional services 'prior to commencing services.' " This is

23

not relevant to the issue he raised on appeal, the refusal to exclude all evidence of oral requests for additional services. Having concluded that the trial court properly denied the motions in limine, we decline to consider Simmons's belated, backdoor substantial evidence challenge. (See, e.g., *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 559 [" 'We will not ordinarily consider issues raised for the first time in a reply brief.' "].)

## DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


BUCHANAN, J.